UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| v. | ) | No. | 3:22-CR-84-RGJ |
| | ) | | |
| | ) | | 18 U.S.C. § 242 |
| | ) | | |
| BRETT HANKISON, | ) | | |
| | ) | | |
| Defendant. | ) | | |

### United States' Response to Defendant's Motion for a Scene View

The United States respectfully asks the Court to deny the defendant's Motion for a Scene View, ECF No. 40.  A scene visit during the defendant's trial is entirely unnecessary because there is abundant alternative evidence to demonstrate to the jury how the scene appeared at the time of the charged offense, and because, rather than assisting the jury, a scene visit would instead provide misleading and prejudicial information about a key issue in this case.  Additionally, a scene visit would disrupt the trial and present overwhelming logistical and safety challenges stemming from the introduction of the jury, the parties, and Court personnel to an uncontrolled environment populated by members of the public.  All of these risks are further compounded and amplified by the significant public attention this case has received.

The defendant is charged with firing ten gunshots late at night through two covered windows into a private home, nearly hitting Breonna Taylor and four other people inside.  A key issue at trial--perhaps *the* key issue at trial—will be whether the defendant could see into those windows and identify a legitimate target before he fired.  On the night of the defendant's shooting, the windows he shot through were covered by closed plastic blinds, decorative curtains and special

blackout curtains that allowed Breonna Taylor and her sister to sleep during the day and work at night. The curtains were removed after the shooting, and are no longer on the windows. Moreover, it is not possible, during a daytime visit to the scene more than three years after the shooting, to re-create the lighting conditions and other obstructions that were present the night of the charged offenses. Accordingly, a site visit would expose the jury to a materially different scene than the one that existed when the defendant committed the acts charged in the indictment. Additionally, there is extensive alternative evidence that can be used to give the jury an *accurate* view of how the scene appeared at the relevant time. This evidence includes more than a thousand pictures and hours of body worn camera video taken the night of the shooting, as well as floorplans and diagrams. Where such alternative evidence exists, courts routinely deny requests for scene views. *See infra*.

    For all of these reasons, the defendant's motion should be denied.

## BACKGROUND

    The defendant, former Louisville Metro Police Department (LMPD) Detective Brett Hankison, is charged with willfully violating the constitutional rights of Breonna Taylor and four other individuals by shooting at them while they were inside their homes in two adjoining apartments in South Louisville. Indictment, ECF No. 1. At approximately 12:30 a.m. on March 13, 2020, defendant Hankison and six other LMPD officers attempted to serve a search warrant at Taylor's home in Apartment 4 of a complex on Springfield Drive to search for narcotics and proceeds from narcotics dealing. Unbeknownst to the officers serving the warrant, a separate group of detectives had obtained the warrant by submitting a falsified affidavit to a Jefferson County Circuit Court Judge; three officers have been charged separately with federal offenses relating to

that falsified warrant.  *See United States v. Jaynes and Meany*, Case No. 3:22-cr-85-CRS; *United States v. Goodlett*, 3:22-cr-86-RGJ.

Shortly after midnight, the seven officers serving the warrant positioned themselves in a breezeway leading to Taylor's home and three adjacent apartments.  The defendant lined up near the back of this stack of officers, near the entrance to the breezeway, away from Taylor's door.  As officers knocked on Taylor's door, Taylor and her boyfriend, K.W., heard banging and stepped out of her bedroom, where the couple had been watching TV, and into the back of the hallway leading to her living room and front door.  Moments later, when officers broke down the door to Taylor's home with a battering ram, K.W.—believing the police were intruders—fired one shot with his lawfully-owned handgun, striking LMPD Sergeant J.M. in the leg.  Sergeant J.M. and a second officer, Detective M.C., quickly returned fire from the doorway, sending a total of 22 rounds into Taylor's home.  Several of their shots hit Taylor at the far end of the hallway, and one of the shots fired by M.C. killed her.  K.W. dove to the ground and was not hit by the officers' gunfire.

When the shooting started, the defendant ran out of the breezeway and retreated to the parking lot along the side of Taylor's home.  From there, the defendant blindly fired two volleys of shots into Taylor's home: (1) five shots through a sliding glass door that was covered with hanging curtains and closed vertical plastic blinds; and (2) five shots through a bedroom window that was covered with a blackout curtain and closed horizontal plastic blinds.  Several bullets from the defendant's first volley of shots traveled across Taylor's living room, passed through the wall that separated her home from neighboring Apartment 3, and nearly hit that apartment's occupants, including a pregnant woman and young child.  Bullets from the defendant's second volley of shots–

3

–fired through the bedroom window covered by a blackout curtain—passed directly over K.W. and Taylor.

After the defendant's indictment, the United States produced five batches of discovery, which included, among other things: more than a thousand pictures taken on the night of the shooting, showing the inside and outside of Taylor's apartment, the adjacent Apartment 3, and the surrounding area; pictures and video of the covered windows that the defendant shot through; and several dozen hours of footage from the bodycam videos of officers who responded to the scene. The discovery also included ballistics and trajectory analyses showing the path of the bullets fired by the defendant and other officers, as well as diagrams, pictures, and floor plans showing the layouts of the apartment homes, the apartment complex, and the surrounding area. Finally, the discovery included summaries of interviews with more than 200 witnesses, many of whom described the conditions at the scene on the night of the shooting.

Although a state-court judge permitted a scene visit in March 2022, during a trial by the Commonwealth of Kentucky on charges that the defendant recklessly endangered Taylor's neighbors, significant differences between the state and federal trials would render a scene visit far more prejudicial and complicated during the upcoming federal trial. During the 2022 state trial, the parties jointly requested a scene visit of the shooting site. The Commonwealth, unlike the federal government, had pursued no charges against the defendant for any crimes against Taylor or K.W., and had charged no crime related to the shots the defendant fired through the bedroom window that was covered with a blackout curtain. Accordingly, the concerns about exposing the jury to misleading information about that windows did not exist in the Commonwealth's case. Trial in the federal case is set to begin on October 30, 2023.

4

**ANALYSIS**

The Court should deny the defendant's request to allow the jury to visit the scene of the shooting during his upcoming trial.  The defendant asks the Court to authorize a scene view so that the jury can see the "front and rear exterior" of Apartments 3 and 4, the interior of both apartments, and the breezeway where officers attempted to serve the warrant, or, alternatively, to view at least the exterior of the properties, including the windows the defendant fired into.  ECF 40 at 1.  District courts have discretion to permit scene visits, but commonly deny such requests in criminal cases where, as here, there are alternative forms of evidence that allow the jury to understand the important features of the crime scene.  A scene visit in this case is not merely unnecessary, it would risk misleading the jury about important facts of the case, as key features of the scene—such as the coverings on the windows the defendant fired through, lighting conditions, and placement of vehicles and other obstructions in the parking lot—have changed and cannot be replicated (particularly during daytime hours during which court would be in session).  Finally, there are enormous logistical and security challenges to facilitating a scene visit to a private home, in a residential area, in a high-profile case.  A scene visit also presents significant risks that the jury will be exposed to prejudicial information in an uncontrolled environment; these risks too are amplified by the significant public interest in this prosecution.

A. **Information about how the scene appeared on the night of the shooting is available from other sources.**

A scene view is unnecessary for the jury to understand the evidence in this case because the Government has provided to the defense numerous pictures, videos, and diagrams—which either side can introduce at trial—showing the scene as it existed on the night of the defendant's shooting, as well as extensive testimony from witnesses about the conditions that existed when the defendant

fired into Taylor's home.  This evidence includes satellite overviews of the entire apartment complex, floor plans and diagrams showing the layout of the apartment homes, pictures of every room inside the apartments as they appeared the night of the shooting, pictures of the apartment windows showing the curtains and blinds that the defendant fired through, pictures of the breezeway where officers lined up to execute the warrant, and pictures of the parking lot showing the vehicles and other objects that were present at the time of the shooting.  The defense also has access to video footage from the night of the shooting, including video taken by officers walking through the apartments shortly after the shooting, videos from officers walking around the perimeter of the apartments, and video from officers monitoring the scene from the parking lot.  This evidence will provide the jury with a comprehensive understanding of the scene as it existed at the relevant time––the night of the shooting.  Indeed, the pictures and videos taken at the scene on March 13, 2020, are the *only* available evidence that can accurately demonstrate the conditions that were present at the time of the shooting.  A scene visit in the middle of trial in November 2023 would expose the jury to an apartment with different window coverings, under different lighting conditions, furnished with different décor, and obstructed by different vehicles in the parking lot.

Where such evidence demonstrating the condition of the scene exists, courts regularly deny scene visits.  *See, e.g.*, *United States v. Crochiere*, 129 F.3d 233, 236 (1st Cir. 1997) (affirming denial of a scene visit and observing that "[a] court generally acts within [its] discretion in denying a motion for a view when there is sufficient evidence describing the scene in the form of testimony, diagrams, or photographs").  The Sixth Circuit recently applied this principle in *United States v. Wilson*, 579 F. App'x 338, 345 (6th Cir. 2017), where it denied a defendant's request to visit a scene—the lower portion of a basketball arena with multiple stairwells, foyers, and exits—where

the defendant had allegedly fired shots at a rival gang member.  The court reasoned that a scene view was unnecessary because "the jury saw photos, diagrams, and surveillance video" of the area. *See also United States v Moonda*, 347 F. App'x 192, 201–02 (6th Cir. 2009) (affirming denial of jury visit to the portion of a highway where a shooting occurred, finding "the [district] court reasonably concluded that the aerial photographs of the scene gave the jury an adequate picture of the surroundings").

Numerous other circuit court decisions have echoed this common-sense conclusion.  *See, e.g.*, *United States. v. Maxie*, 294 F. App'x 247, 249 (8th Cir. 2008) (affirming denial of a jury view of a vacant lot in a narcotics prosecution where "the record include[d] several photographs of the scene, a diagram, and the testimony and extensive cross-examination of the two detectives who were present at the scene"); *United States v. Gadsden*, 215 F. App'x 283, 286 (4th Cir. 2007) (citing "the fact that photographs of the scene [were] available for the jury to review" in affirming the denial of jury visit to the scene of a robbery); *United States. v. Chiquito*, 175 F. App'x 215, 217–18 (10th Cir. 2006) (rejecting defendant's request for the jury to visit the scene to see "the distances between the places involved" because "the government had numerous photographs of the area where the incident occurred").

The same principle applies here.  The defendant's motion does not explain why the pictures, videos, diagrams, and testimony depicting the scene's appearance at the time of the shooting are insufficient to show the jury what the scene was like on the night of the incident.  Although the defense motion claims that a scene visit would "allow for a more comprehensive outlook of the entire scene" and would help the jury "better comprehend the dimension of the structure which houses both of the dwellings," ECF 40 at 4, it fails to specify any anticipated factual issue—or the

testimony of any witness—that cannot be understood from pictures, videos, diagrams, and testimony.  *See Wilson*, 579 F. App'x at 345 (denying defense request for a scene visit where the defense did "not explain why these exhibits [pictures of the scene] were insufficient in any respect").  Accordingly, the Court should deny the defendant's request for a scene visit.

### B.   Key elements of the scene have changed since the shooting and would prejudice the jury.

Not only is a scene view unnecessary in light of the available pictures, videos, and diagrams, it would also expose the jury to highly misleading information on a point that is central to a key factual determination in this case: what the defendant perceived at the moment he fired his weapon. There have been important changes to the scene since the shooting.  As noted above, the shooting occurred after midnight, while the windows to Taylor's home were covered with blinds and curtains, and with several large vehicles parked along the side of her apartment, near the spot where the defendant fired.  During a recent visit to the scene, the Government confirmed that these window coverings are no longer present, and that Apartments 3 and 4 are both rented to new tenants.

Visiting the scene under different lighting conditions, with different coverings on the windows, and different obstructions in the parking lot, would prejudice the jury's consideration of the evidence relevant to what the defendant perceived when he fired his weapon on the night of March 13, 2020.  The absence of the special window coverings, in particular, may mislead the jury into believing that the defendant could see into the apartment—contrary to the evidence the Government expects to introduce at trial, which will prove that he could not.  In short, "the scene could appear quite different than it appeared at the time of the crime and . . . jurors could be improperly influenced by other factors at such a viewing."  *Maxie*, 294 F. App'x at 249; *see also Moonda*, 347 F. App'x at 202 (affirming denial of scene visit to the segment of a highway where a

shooting occurred because it would involve different traffic flow and a "different environment" from the time of the shooting); *Chiquito*, 175 F. App'x at 217-18 (affirming denial of jury view to a vacant lot surrounded by a fence in part because "a daytime visit would not necessarily portray the scene as it appeared on the night of the shooting—thus potentially confusing or misleading the jury"); *United States v. Culpepper*, 834 F.2d 879, 883 (10th Cir. 1987) (in a narcotics prosecution, the court properly denied a jury visit to a field where the defendant hid drugs because heavy rain made the field appear different than it was at the time of the offense). Even if the jury were told to disregard the window coverings, the risk that jurors would subconsciously be influenced remains high.[1]

The defendant's motion attempts to counter this point by arguing that the "underlying structure at issue remains intact." ECF 40 at 5. But the relevant factual issue in this case is not the physical structure of the apartment building where Taylor lived; it is whether the defendant could see into it at 12:45 a.m. when he fired ten rounds through her covered windows. The factors relating to that most-pressing question—the window coverings, lighting conditions, and obstructions—have changed dramatically since the shooting.

The authority cited by the defendant does not address this point. *See* ECF 40 at 5 (citing *Martin v. Gulf States Utilities Co.*, 344 F.2d 34, 36 (5th Cir. 1965)). In *Martin,* the Fifth Circuit

---

[1] The risk of "improperly influenc[ing]" the jury on a site visit is especially pronounced with respect to the bedroom window that the defendant fired through. When the defendant fired through the window at 12:45 a.m. on March 13, 2020, the window was covered with closed plastic blinds and a blackout curtain. Allowing the jury to view the window during daylight hours, without the coverings that were on the window at the time, would give a misleading and prejudicial impression of what the defendant could see inside the apartment when he fired his weapon. This issue was not present during the site visit in the defendant's state trial because, unlike this case, the Commonwealth did not charge him with shooting unlawfully through the bedroom window.

held that a district court did not abuse its discretion by allowing the jury in a civil negligence case to visit the scene where an electrician had been shocked when he moved an uninsulated cable connecting a transformer on a utility pole to a box on a nearby residence. Although the court noted that the appearance of the scene had changed "by the trimming of the trees around the utility pole," *id*. at 37, nothing in the court's brief discussion indicates that the height of the trees was relevant to the jury's consideration of the utility company's negligence. Here, by contrast, the different lighting conditions, obstructions, and window coverings are critical to the jury's assessment of the defendant's shooting.[2] The Court should not permit the jury to be influenced by these changed material conditions.

### C. Visiting the scene would disrupt trial, create logistical challenges, and risk exposing the jury to extra-judicial information.

This Court should deny the defendant's motion for the additional reason that a scene visit would disrupt trial and expose the jury to an environment that is difficult to control, where jurors may be exposed to prejudicial information that is not presented as evidence. Apartments 3 and 4 are both private homes occupied by new tenants and are part of a large apartment complex with dozens of units and hundreds of residents. Like homes in all large apartment complexes, Apartments 3 and 4 and the units around them are accessed regularly by residents, guests, service workers, and others. There is no way to ensure that the jury will not interact with such individuals or otherwise be exposed to extra-judicial information. *See Kelley v. Wegman's Food Markets, Inc.*, 98 F. App'x 102, 105 (3d Cir. 2004) (affirming denial of a jury visit to a Wegman's grocery store

---

[2] The only other case cited by the defendant on this point is *Northwestern National Casualty Co. v. Global Moving and Storage Co.*, 533 F.2d 320 (6th Cir. 1976). That case is clearly inapposite, as it involved a civil bench trial where a judge—not the jury—visited the scene of a warehouse fire before the trial began.

because it "would be time consuming" and "difficult to control" the scene). Such disruptions have happened in other cases. *See, e.g.*, *Walton v. Marshal*, 1986 WL 17070, at *4 (6th Cir. 1986) (defense moved for a mistrial after a bystander approached the jury during a scene visit and told jurors that the defendant was guilty and should be hung).

The risk of such incidents is heightened in this case by the significant public interest in Ms. Taylor's death and expected media coverage of the proceedings against the defendant. Additionally, given the expected challenges of picking a jury in this case, any incident necessitating a mistrial would require the court and parties to expend significant resources.

Finally, a scene visit would needlessly create logistical issues and safety risks to the jury, the attorneys, and the Court. The Government understands that, although the U.S. Marshals Service could manage the logistical issues related to a site visit, the Marshals would have to seek additional resources from outside the immediate area to do so. The Marshals also informed the Government that they believe a visit to the uncontrolled, open area at the scene of the shooting could pose safety risks for the Court and jurors. It is unnecessary to take such risks here, where the jury can rely on voluminous evidence presented in the courtroom that depicts the scene as it existed the night of the shooting.

## CONCLUSION

For the foregoing reasons, the United States respectfully asks the Court to deny the defendant's motion for a scene view.

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General


/s Michael J. Songer
Michael J. Songer
Special Litigation Counsel
Criminal Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-3204
Michael.Songer@usdoj.gov

/s Anna Gotfryd
Anna Gotfryd
Trial Attorney
Criminal Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-3204
Anna.Gotfryd@usdoj.gov

Authority Conferred by 28 U.S.C. § 515

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to all parties.

*s/ Michael J. Songer*
Michael J. Songer
Civil Rights Division
