UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA     Plaintiff

v.     Criminal Action No. 3:22-cr 84-RGJ

BRETT HANKISON     Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Defendant Brett Hankison moves "for leave to conduct post-trial interviews of jurors." [DE 252 at 13577]. The United States responded in opposition. [DE 257 at 13681]. Hankison did not reply and the time for doing so has expired. The matter is ripe. For the reasons below, the Motion for Leave to Conduct Post-Trial Juror Interviews [DE 252] is **DENIED.**

### I. BACKGROUND

#### A. Jury Selection.

Jury selection occurred October 15, 2024 through October 18, 2024. In advance of jury selection, this Court sent a lengthy questionnaire to all potential jurors eliciting opinions on several topics and exploring prior knowledge of the case and its surrounding litigation. Because of the large of amount of information available on the internet (including YouTube videos of Hankison's state court trial), the significant public unrest that followed the shooting of Breonna Taylor, the prior federal mistrial, and continuing media coverage, the Court determined that individualized *voir dire* of potential jurors was required to ensure a fair and impartial jury. As a result, the Court conducted in-person, individualized questioning of each juror in the Court's library with counsel and defendant present.

1

The individual *voir dire* was conducted without the public and in the more comfortable library environment to maintain the juror's anonymity and encourage full and complete disclosure of, at times, very personal opinions on topics such as race, community policing, and the nature of the prior unrest regarding the shooting of Breonna Taylor. The Court engaged in the majority of questioning and then permitted both counsel to ask follow up questions. Interviews took as long as necessary to allow for full inquiry by all parties. A court reporter was present, and after jury selection was complete, the transcripts were made available in the court record. The Court and parties referred to jurors only by their juror number, and those numbers were disassociated from the juror names on questionnaires, transcripts, and other documents to ensure confidentiality. After each juror was interviewed, counsel was given the opportunity to make strikes for cause based on their questionnaires or interview responses.

As relevant to this motion, the questionnaires and jury interviews specifically included inquiry about the community unrest which occurred after the shooting of Breonna Taylor and the potential of additional unrest resulting from any verdict in this case. The questionnaire included:

> "Are you concerned that unrest may result from a guilty or not guilty verdict in this case? If yes, please discuss your concerns."
>
> "Whether you participated or not, have you ever been personally impacted by any such protest or civil disobedience in Louisville or any other metropolitan area? If yes, please describe any personal impact."

[DE 187; DE 190; DE 191]. This question was also covered at length in each juror interview. Hankison's counsel did not object to or move to strike any of the twelve deliberating jurors during *voir dire* based on their responses to questions about the possibility of public unrest after trial.

### B. Protection of Juror Integrity During Trial.

Prior to and during trial the Court issued several orders and acted to ensure the integrity of the jury process and to minimize the risk of any outside influences.

First, the questionnaires contained specific instructions in bold regarding outside influences which the jurors had in hand from the moment they became aware of the nature of the trial. Those instructions stated:

- **You are instructed and required not to conduct any outside research about the case, the subject matter, the prosecution, or the defendant. This prohibition covers all kinds of research, including online or other technological research.**
- **You may not discuss the case or this questionnaire with anyone, including family members, friends, and fellow prospective jurors.**
- **You may not share information about your service as a juror with anyone, including on social media websites, blogs, or the like.**
- **From the day you receive this questionnaire until the end of jury selection, you are instructed not to seek out information about this case, and, to the extent possible, to limit your exposure to information about this case. These obligations will continue until the Court expressly instructs you otherwise.**
- **Failure to abide by these instructions could result in Court-imposed consequences or sanctions.**

[DE 187; DE 190; DE 191]. These admonitions were reiterated each day of the trial and each time the jury came and left the courtroom and included the instruction that they must only consider information "heard within the four walls of this courtroom." [DE 221 at 12665, ln. 8 - 12667, ln. 23]. The Court even specifically instructed jurors with smart phones to disable news media notifications to prevent accidental exposure to current reporting about the trial. [DE 221 at 12665, ln. 25 - 12666, ln. 7].

Prior to trial the Court also issued an Order for Rules of Trial. [DE 185]. That order contained decorum instructions intended to prevent outside influences from reaching the jurors and to protect their identities while in the courtroom. The order stated:

- Consistent with General Order 2018-09 RE: Courthouse Security and Limitation on the Use of Portable Communication Devices Within the United States Courthouses in the Western District of Kentucky, portable communication devices are not allowed in the courtrooms except by court employees, officers of the court engaged in the conduct of court business, and law enforcement personnel.
- Consistent with the Judicial Council's Policy Guidelines, cameras of any kind (including camera telephones and laptop computer cameras), video cameras of any kind (including video telephones and video cameras connected to laptop computers), and audio recording devices of any kind are not permitted in the Courthouse
- No conversations or gestures that would disrupt the proceedings or distract jurors or witnesses are permitted.
- No signs, hats, t-shirts, or other clothing that display slogans that could be construed to influence members of the jury or make any statement about any issue relevant to the trial will be permitted. Enforcement of this prohibition is left to the sole discretion of the Court and U.S. Marshal.

[DE 185 at 5962].

During trial the Court also issued a partial sequestration order for jury management. [DE 198 at 9282]. To manage the trial efficiently and expeditiously and "to minimize the risk of the juror's exposure to attorneys in this case, witnesses, the defendant, media, and crowds during entry and exit of the courthouse during the lunch hour," the Court ordered sequestration during lunch. *Id.* In addition, the United States Marshals Service was ordered to take certain daily measures to safeguard the jurors' anonymity and shield them from inadvertent interactions with the public and media during their arrival and departure from the courthouse. [DE 199 (Sealed Order)]. No allegations have been presented that any of these orders were violated.

### C. Jury Deliberations and Verdict.

The jury trial began on October 21, 2024 and continued through October 24, 2024; and October 28, 2024 through November 1, 2024. At the conclusion of closing arguments, alternate jurors were pulled by the Court on October 30, 2024 at 1:20 p.m. Those jurors were released from service and the remaining twelve jurors deliberated until approximately 5:00 p.m. The jury

4

returned at 9:00 a.m. on October 31, 2024 and deliberated until they requested to adjourn at 4:00 p.m. The jury again returned November 1, 2024 at 9:00 a.m. and deliberated with limited questions until indicating through a note to the Court that they were unable to reach a unanimous verdict at 12:22 p.m. With the agreement of all counsel, the Court gave an Allen charge on both counts.

At 5:52 p.m. the jury reported they continued to disagree "on one count." After consultation with counsel, the Court read the partial verdict instruction permitting them to return a verdict on one count before continuing to deliberate on the remaining count. While all counsel agreed to the partial verdict instruction, defense counsel initially opposed the reading of a second Allen charge.

At 6:43 p.m. the jury delivered a unanimous verdict of not guilty as to Count 2 of the Indictment. The verdict was published in open Court at 6:50 p.m. and the jury was polled. Having consulted their client off the record, the defense counsel then withdrew their objection to the second Allen charge but agreed with the court to give the option for the jury to continue deliberations or adjourn for the evening and return on Monday. With the parties in agreement, the Court read to the jury the second Allen charge as to Count 1 of the Indictment at 7:10 p.m. and gave the jurors the option to continue deliberations or adjourn for the evening. The jury indicated to the Court at 7:22 p.m. that they would continue deliberations and dinner was ordered for the jury.

A final note was sent to the Court at 9:02 p.m. stating that the jury had reached unanimous verdict as to Count 1 of the Indictment. The jury delivered a unanimous verdict of guilty as to Count 1 of the Indictment. The verdict was published in open Court at 9:20 p.m. as to Count 1 and the jury was polled.

At the conclusion of their service, the Court reminded the jury of Local Rule 24.1(a) and stated:

> I'm going to advise you, as I have before, that local criminal Rule 24.1 provides that you may not be contacted by anyone to be interviewed or communicated with before, during, or after the trial. And that is a local rule that we enforce. If anyone does try to contact you, you are to contact my chambers or the district court and we will handle that appropriately.

[DE 243 at 11834, ln. 5-11].

## II.     ANALYSIS

Hankison moves for leave to conduct post-trial interviews of jurors "regarding any external or unlawful influences to which any juror may have been exposed." [DE 252 at 13578]. Hankison asserts that

> [t]he specter of external influence improperly impacting the jury carries bears [sic] greater consideration in this matter given the concerns expressed by various jurors about potential civil unrest that may occur depending on the outcome of the trial, and given the emotional medical episode experienced by Juror #108 on October 18, 2024, which required medical attention, and was observed by at least some segment of the jurors.
>
> Given the length of deliberations as well as the jury indicating that they were unable to reach a unanimous verdict on two occasions prior to a guilty verdict, this court is well within its discretion to allow juror interviews.

*Id.* (citation omitted). The United States opposes the motion asserting that Hankison has not presented any colorable claims of outside influences that would warrant permitting such an inquiry. [DE 257 at 13684].

The decision whether to allow attorneys to interview jurors post trial lies in the sound discretion of the trial judge. *Freeman v. Bandy*, 2013 WL 5835773, at *2 (M.D. Tenn. Oct. 30, 2013) (citing *Holmes v. Telecheck Int'l, Inc.,* 2008 WL 687098, *1 (M.D. Tenn. Mar.10, 2008) and *Wilkerson v. Johnson,* 699 F.2d 325, 330 (6th Cir. 1983)). It is well established that federal courts generally disfavor post-trial juror interviews. *Nabkey v. Hoffius,* 827 F.Supp. 450, 454, n. 2 (W.D.Mich. 1993) ("The First Amendment interests of litigants and attorneys to satisfy their

6

curiosity and improve their advocacy are outweighed by the jurors' interest in privacy and the public's interest in well-administered justice.").

The principal purpose of refusing contact with jurors following the verdict is to prevent "fishing expeditions in search of information with which to impeach jury verdicts." *Tschira v. Willingham,* 135 F.3d 1077, 1089 (6th Cir. 1998). The Supreme Court has explained the substantial policy considerations of this prohibition at length.

As early as 1915 this Court explained the necessity of shielding jury deliberations from public scrutiny:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation— to the destruction of all frankness and freedom of discussion and conference.

*Tanner v. United States*, 483 U.S. 107, 119–20 (1987) (quoting *McDonald v. Pless,* 238 U.S. 264, 267-68 (1915)). "Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." *Tanner*, 483 U.S. 107, 120-21 (citing Note, Public Disclosures of Jury Deliberations, 96 Harv.L.Rev. 886, 888–892 (1983)); *United States v. Odunze*, 278 F. App'x 567, 573 (6th Cir. 2008).

Federal Rule of Evidence 606(b) further reflects this prohibition and limits the scope of permissible juror testimony:

> A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

7

Fed. R. Evid. 606(b). Additionally, this prohibition is reflected in Local Rule 24.1(a), which states that "[u]nless permitted by the Court, no person, party or attorney, nor any representative of a party or attorney, may contact, interview, or communicate with any juror before, during or after trial."

"The only exception to this strict restriction is that a juror may testify as to whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether there was a mistake in entering the verdict onto the verdict form." *Telecheck Int'l, Inc.*, 2008 WL 687098, at *2 (citing Fed. R. Evid. 606(b)); *American Trim, L.L.C. v. Oracle Corp.,* 217 F.Supp.2d 826, 828 (N.D. Ohio 2002). "Absent a showing of juror impropriety, litigants and attorneys have no right to invade the province of the jury room." *Telecheck Int'l, Inc.*, 2008 WL 687098, at *1.

Under 606(b), the Sixth Circuit has repeatedly required a defendant seeking post-trial juror interviews to show "a 'colorable claim' that jurors were exposed to external influences likely to taint the verdict." *United States v. Kechego*, 91 F.4th 845, 852 (6th Cir. 2024); *United States v. Bailey*, 2022 WL 2444930, at *8 (6th Cir. July 5, 2022) (the claim "must be supported by credible evidence"); *United States v. Gonzales*, 227 F.3d 520, 527 (6th Cir. 2000) (claim must present a "likelihood of having affected the verdict"). "But a claim of external influence is not colorable merely because it is possible." *Kechego*, 91 F.4th at 850 (citing *United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017) ("[A] *Remmer* hearing is not necessary in every instance of possible unauthorized third-party contact.")). A defendant must make a supported assertion that the jury deliberations were prejudiced by information "derive[d] from a source external to the jury." *Warger v. Shauers*, 574 U.S. 40, 41 (2014) (citing *Tanner*, 483 U.S. at 117). "But if the case instead involves an 'internal influence,' the constitution does not require post-verdict interrogation of jurors." *Smith v. Nagy*, 962 F.3d 192, 200 (6th Cir. 2020).

As a result, the key inquiry is whether the alleged colorable claim is an external or internal influence. The Sixth Circuit has laid out the differences as follows:

> The distinction between external and internal influences is therefore critical. In *Tanner*, the Supreme Court decided that allegations of jurors being intoxicated during the trial related to an internal influence . . . [f]ocusing on 'the nature of the allegation rather than the physical location of the jurors at the time the alleged misconduct occurred' . . . *Tanner* Court distinguished cases where a bribe was offered to a juror . . . a court bailiff made comments about the defendant in the presence of the jury . . . where a juror submitted an employment application to the prosecutor's office during the trial . . . and where jurors brought newspaper articles about the case into the jury room . . . [i]nstead, the Court likened the circumstances in *Tanner* to a claim that a juror had a psychological disorder . . . or a claim that a juror did not understand English . . . [m]ore recently, the Supreme Court unanimously decided that alleged bias based on a juror's own personal experiences also constituted an internal influence . . . '[e]xternal' matters include publicity and information related specifically to the case the jurors are meant to decide, the Court explained, 'while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room.
>
> Likewise, we have explained that an external influence 'must either relate to the case that the jurors are deciding or be physically brought to the jury room or disseminated to the jury' . . . [c]onsiderations based on jurors' 'general knowledge' or 'their own wisdom, experience, and common sense' do not constitute external influences . . . we found an external influence where jurors looked up the defendant's Facebook profile and performed a Google search for information relating to issues in the case . . . [b]ut we found no external influence where a jury decided to sentence a defendant to death after discussing a news account of a different defendant who had committed murder after being paroled.

*Smith*, 962 F.3d at 201 (internal citations omitted).

Defendants generally present three vague arguments to support post-trial juror interviews in this case: (1) "concerns expressed by various jurors about potential civil unrest that may occur depending on the outcome of the trial;" (2) "the emotional medical episode experienced by Juror #108 on October 18, 2024;" and (3) the jury indications to the Court that "they were unable to reach a unanimous verdict on two occasions prior to the guilty verdict."

### A. Concerns Expressed By Various Jurors About Potential Civil Unrest.

Hankison generally alleges juror concerns "about potential civil unrest that may occur depending on the outcome of the trial" but fails to indicate how this may have affected deliberations. No assertions were made by any jurors regarding this issue during the trial or the deliberations and the Court finds no evidence that any extraneous external influence was improperly brought to the jury's attention on this issue or that concerns of possible unrest played any role in the deliberations or prejudiced the verdict. Moreover, based on the lack of specificity, it is impossible to determine whether this allegation would potentially involve and external or internal influence. *Smith*, 962 F.3d at 201. As a result, Hankison has failed to present a colorable claim of an external influence "[likely to] hav[e] affected the verdict" and a post-verdict inquiry is unwarranted.

Moreover, this issue was fully explored in the questionnaire, as well as in the individualized inquiry made by the court and counsel during the *voir dire* process. Despite a full opportunity to explore these issues with the jurors, Hankison's counsel did not object or move to strike any of the twelve jurors who deliberated on these grounds. To the extent this issue was already explored during *voir dire* and counsel did not move to strike any of the deliberating jurors based on this issue, any objection now is waived. *Marks v. Shell Oil Co.*, 895 F.2d 1128, 1129–30 (6th Cir. 1990) ("Marks waived this ground for challenging Kenney's fitness for jury service by failing to raise it at voir dire . . . [a]lthough Marks did challenge Kenney as a juror for cause, Marks's challenge was based on Kenney's past employment in the oil business . . . Marks never suggested that Kenney could not be an impartial juror because of any concerns he had over the effect that his time in jury service would have on his business. This failure cannot stem from any lack of notice to Marks of Kenney's concerns because they were discussed in full during the voir dire."); *see also*

*Smith v. Vicorp, Inc.,* 107 F.3d 816, 819 (10th Cir.1997) ("Plaintiff's speculation that the jury's refusal to award damages after finding a reckless and wanton invasion of privacy was the result of tort reform bias falls too wide of the mark" when counsel had "the opportunity to ferret out possible tort reform bias" during *voir dire*); *Dougherty v. Marshalls of MA, Inc.,* No. 08-CV-3443, 2011 WL 1562251, at *7 (E.D. Pa. Apr. 26, 2011), *aff'd,* 460 F. App'x 132 (3d Cir. 2012). *See generally Ross v. Oklahoma,* 487 U.S. 81, 86 (1988) (concluding that a criminal defendant failed to establish that the jury was not impartial when, among other things, none of the jurors who ultimately served was challenged for cause).

### B. Medical Episode Experienced By Juror #108 On October 18, 2024.

Hankison also generally alleges that the "emotional medical episode" experienced by Juror #108 which was "observed by at least some segment of the jurors," was an outside influence on jurors but again fails to indicate how this may have affected the deliberations or prejudiced the verdict. [DE 252 at 13578]. On the first day of opening statements, Juror #108 had a medical issue which involved some level of anxiety about the court proceedings and his presence in the courthouse. [DE 221 at 12654, ln. 3 – 12655, ln. 5]. Specifically, the Court explained to counsel that "[h]e has disclosed to us a prior medical condition including a brain bleed that occurred well in advance -- first one in 2016, second one in 2018. He has stress -- when he gets stressed, he has episodes." [*Id.*]. This individual had not disclosed this medical issue as part of his questionnaire or interview. [DE 237 at 11137, ln. 8 – 11145, ln 6; DE 270]. Defense counsel did not ask any follow up questions and did not object on any grounds to his qualification. Notably, however, for purposes of this motion, Juror #108 experienced this medical issue while the jurors were moving their cars before being sworn in and the Court explained to counsel on the record that "[o]n the positive side, most of the jurors had already left to get their cars." [DE 221 at 12654, ln. 12-13].

11

The Court presented this issue to counsel and both sides agreed to excuse the juror and continue with one fewer alternate. Counsel raised no concerns that the episode could adversely impact the juror's deliberations or prejudice the verdict. To the extent this issue was presented to counsel, and no objections were made at the time, this argument is also likely waived. *Marks*, 895 F.2d at 1129–30.

Regardless, this issue happened before opening arguments began and nearly two weeks prior to deliberations. Hankison has presented no credible evidence that this incident is an external influence as the Supreme Court has defined it or that it had any effect on the deliberations. As a result, the Court find no reason to permit post-trial interviews on this issue.

**C. Inability To Reach Unanimous Verdict.**

Finally, Hankison asserts that the length of the deliberations or inability to reach a verdict without the use of *Allen* instructions somehow influenced deliberations warranting post-trial interviews. Counsel suggests that the length of deliberations and the deadlocked nature of those deliberations somehow indicates external influence. But, Hankison provides no evidence regarding what the external influence was or how the deliberations were influenced. Without more, this argument is mere speculation amounting to a fishing expedition and does not support post-verdict jury inquiry.

Notably, counsel does not argue that the *Allen* instructions were unduly coercive, nor could they, given both the amount of time between the instructions and the verdict as well as their own agreement to the instructions.

## III.   CONCLUSION

Having considered the motion and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS** that Hankison's Motion for Leave to Conduct Post-Trial Interviews [DE 252] is **DENIED.**

Rebecca Grady Jennings, District Judge
United States District Court

February 6, 2025

cc:   Counsel of record