UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                                Plaintiff

v.                                                                  Criminal Action No. 3:22-cr 84-RGJ

BRETT HANKISON                                                                        Defendant

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Defendant Brett Hankison ("Hankison") was charged with two counts of deprivation of rights under color of law. *See* 18 U.S.C. § 242. The Court conducted jury selection October 15, 2024 through October 18, 2024. [DE 251 at 13571]. The jury trial began on October 21, 2024 and continued through October 24, 2024; and October 28, 2024 through November 1, 2024. [*Id.*]. The jury began deliberations October 30, 2024 at approximately 1:30 p.m. [*Id.*]. On November 1, 2024 at 6:43 p.m., after receiving a partial verdict instruction, the jury delivered a unanimous verdict of not guilty as to Count 2 of the Indictment. [*Id.* at 13572]. The verdict was published at 6:50 p.m. and the jury was polled. [*Id.*]. After additional instructions and deliberations, the jury delivered a unanimous verdict of guilty as to Count 1 of the Indictment. [*Id.*]. The verdict was published at 9:20 p.m. and the jury was polled. [*Id.*]. Hankison moves for acquittal under Fed. R. Crim. P. ("Rule") 29(c)(2), renewing his arguments made under Rule 29(a) and (b) during trial and at the close of all proof. [DE 253]. The United States responded [DE 258]. Hankison did not reply and the time for doing so has passed. For the reasons below, Hankison's motion for acquittal [DE 253] is **DENIED**.

## I. STANDARD

"Review of a jury verdict is suspect and, indeed, the Courts have established a rather strict test for granting a Motion for Acquittal." *United States v. Turner*, 490 F. Supp. 583, 588 (E.D. Mich. 1979), *aff'd*, 633 F.2d 219 (6th Cir. 1980). A court should grant a motion for judgment of acquittal under Rule 29 only when the evidence admitted at trial, viewed in the light most favorable to the United States, was insufficient to permit a rational trier of fact to find guilt beyond a reasonable doubt. *United States v. Connery*, 867 F.2d 929, 930 (6th Cir. 1989) (citations omitted). Put differently, a court should not grant a motion of acquittal unless "'the prosecution's failure is clear.'" *Id.* (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)). In evaluating challenges to sufficiency of the evidence, a court must not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States v. Siemaszko*, 612 F.3d 450, 462 (6th Cir. 2010) (citations and quotation omitted). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004) (quoting *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (citation and quotation omitted)). "A defendant claiming insufficiency of the evidence bears a very heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (internal quotations omitted).

## II. ANALYSIS

Hankison's motion requests judgment of acquittal on two grounds already considered by the Court during trial. First, Hankison argues that the evidence at trial was insufficient to prove beyond a reasonable doubt that the defendant intentionally restrained Breonna Taylor's ("Taylor") movement by force. [DE 253 at 13581]. Second, Hankison asserts that the evidence was insufficient to prove that Taylor was alive at the time he fired shots through a bedroom window.

[*Id.* at 13582]. Hankison argues that "the Government failed to prove that Ms. Taylor was alive at the time Mr. Hankinson fired his second volley of shots through the bedroom window, let alone that Ms. Taylor was conscious and her movement was somehow restrained by Brett Hankinson." [*Id.* at 13582].

The United States argues that the "evidence presented at trial, viewed in the light most favorable to the government, supports the jury's guilty verdict and requires denial of the defendant's Motion." [DE 258 at 13695]. The United States argues that the evidence was sufficient to find that Taylor was seized, and that Defendant used excessive force during a continuing seizure. [DE 258 at 13695-97]. Moreover, the United States asserts that Hankison's shots separately seized Taylor. [*Id.* at 13698-99]. And finally, the United States argues that there was sufficient evidence for the jury to conclude that Taylor was alive when Hankison fired into the bedroom window. [*Id.* at 13700-02].

Hankison's arguments, that the United States failed to prove beyond a reasonable doubt that Taylor was alive at the time the shots were fired and that her movement was restrained, were both presented to the Court on motion at the close of proof and to the jury in closing arguments. The Court denied Hankison's Rule 29 motions on these issues at the close of the United States' proof and the close of the case. Additionally, the jury had the opportunity to consider both arguments during deliberations and found sufficient proof to convict on Count 1.

The elements of Count 1, Deprivation of Rights Under Color of Law (18 U.S.C. § 242), are that (1) Hankison acted under color of law; (2) he deprived Taylor, a living person, of a Constitutional right to be free from unreasonable seizures, which includes the right to be free from a police officer's use of unreasonable force; (3) Hankison acted willfully; and (4) the offense involved a dangerous weapon or an attempt to kill. Hankison's motion only argues two aspects of

3

the second element – that Taylor was seized and that she was alive at the time of Hankison's unreasonable force. As such, Hankison concedes all other elements of Count 1 and the Court will only address those two aspects of the second element.

### A. The evidence was sufficient for a jury to conclude, beyond a reasonable doubt, that Breonna Taylor was seized.

A Fourth Amendment seizure occurs when an officer restrains the liberty of an individual in such a way that a reasonable person would reasonably believe under the circumstances that he or she was not free to leave. *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988). A seizure can occur in one of two ways: (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control. *Torres v. Madrid*, 592 U.S. 306, 316, 321-22 (2021). The first type of seizure covers uses of physical force, such as when an officer shoots an individual. *Id.* at 318. Had Hankison's shots hit Taylor, then she would have been seized by use of force with intent to restrain. *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476 (6th Cir. 2022). As Hankison's shots did not hit Taylor and there was no physical contact between the two, the Court analyzes whether Taylor was seized by a show of authority with acquisition of control. *Id.* "Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." *Torres*, 592 U.S. 306, 322. Hankison does not appear to dispute that the shots he fired into Taylor's apartment were a show of authority, instead Hankison contends that Taylor's movement was not restrained specifically by Hankison's shots, and thus she was not seized by Hankison.

In *Campbell*, the Sixth Circuit discussed at length what "constitutes a submission to a show of authority or a termination of freedom of movement." 47 F.4th at 476. In sum, when an officer blocks an individual in their home, the officer has terminated the individual's freedom of movement and a seizure has occurred under the Fourth Amendment. *See id.*; *Ewolski v. City of*

4

*Brunswick,* 287 F.3d 492 (6th Cir. 2002) (finding that officers surrounding a residence qualified as an "intentional application of physical force and show of authority made with the intent of acquiring physical control" and "this assertion of force and authority succeeded in restraining Mr. Lekan's liberty to leave his home" even though he barricaded himself in and was not in police custody at the time). Yet, when an officer orders an individual to stop running but the individual flees the scene, then there has been no seizure, and no submission to authority or termination of movement. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991). As a result, the question is not whether an officer's bullet struck an individual, but whether the officer's intentional "firing [of] his weapon at [the individual] was a show of authority that actually had the intended effect of contributing to [the individual's] immediate restraint." *Thompson v. City of Lebanon*, 831 F.3d 366, 371 (6th Cir. 2016) (quoting *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)). If the individual's movement or ability to leave has been restrained, she has been seized. *Id.* Court's in this Circuit also make the critical distinction that "what is required is that a person's ***freedom of movement*** had been terminated, not that the person's ***movement itself*** had been terminated." *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 264 (S.D. Ohio 2021), *modified sub nom. Alsaada v. City of Columbus, Ohio*, No. 2:20-CV-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021) (emphasis added).

The Court in *Campbell* also addressed circumstances in which the submission to authority "takes the form of passive acquiescence." 47 F.4th at 477 (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)).

> The [Supreme] Court explained that "a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" "Examples of circumstances that might indicate a seizure" include "the threatening presence of several officers [or] the display of a weapon by an officer."

5

*Id.* (citations omitted); *United States v. Mendenhall,* 446 U.S. 544, 553 (1980)( "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."); *Brower v. County of Inyo,* 489 U.S. 593, 597 (1989) (finding that a Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement *through means intentionally applied.*") (emphasis in original). The test established here is objective: "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Campbell*, 47 F.4th at 477 (quoting *Hodari D.*, 499 U.S. at 628). In analyzing whether an individual has submitted to a show of authority, the Court reviews "what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin*, 551 U.S. at 262.

The Sixth Circuit has also found that it does not matter whether the officer or officers knew who or how many individuals their show of authority may seize. *Campbell*, 47 F. 4th at 478.

> We have explained that when an officer seizes one person by shooting at a car, for example, the officer seizes everyone in the car, even if the officer is unaware of the presence of passengers. The same logic extends to the home: just as shooting at a car and causing it to stop terminates the freedom of movement of everyone in the car, so does shooting into a house in a manner that prevents occupants from leaving constitutes a seizure of the occupants.

*Id.* (citations omitted). And the Sixth Circuit has explained that, once a person has been seized, the "seizure 'continues throughout the time the person remains in the custody of the arresting officers'" or believes that they are not free to leave. *Cummin v. North*, 731 F. App'x 465, 471 (6th Cir. 2018) (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988)). This remains the case unless the seized individual takes actions that "terminate[ ] the seizure," such as to flee the

6

scene or express their own retaliatory force. *United States v. Johnson*, 631 F. App'x 299, 303 (6th Cir. 2015).

Here, there can be no question that when officers forcibly opened Taylor's front door with a ram while armed and brandishing their weapons, all the individuals in Taylor's apartment would have objectively believed that they were not free to leave. *Ewolski,* 287 F.3d 492. The officers forcibly opening the apartment door with guns drawn to serve a search warrant was without question a show of authority intended to restrain the individuals in the apartment and which did, in fact, restrain the individuals in the apartment.[1] When officers in the doorway began shooting, it is clear that Taylor effectively submitted to the officers' show of authority by remaining in the apartment and her freedom of movement was restricted. *Campbell*, 47 F.4th at 477 ("When Fox shot at their front door, the Campbells effectively submitted to his show of authority by remaining in their home . . . [b]y remaining on their property rather than leaving after shots were fired at their door, the Campbells submitted to Fox's show of authority and were restricted in their movement."). Viewing the testimony and evidence in the light most favorable to the United States, a reasonable juror could easily find that Taylor was seized in her apartment by the initial actions of the officers at the apartment door.

Moreover, the seizure of Taylor was continuous from the time officers breached the apartment door through the time Hankison fired his shots through the bedroom window. The testimony at trial established that the entire incident from the first shots to the last took a mere 10-15 seconds, depending on which of the officer's testimony a reasonable juror might credit. But even fully crediting Hankison's own testimony, the entire incident—from the time that officers breached Taylor's apartment door until Hankison and Cosgrove fired their final shots—lasted only

---

[1] While the analysis may be slightly different for Kenneth Walker ("Walker") because he fired back at officers, such analysis is irrelevant to the Rule 29 motion on Count 1 as to Taylor.

ten seconds. [DE 222, Tr. Vol. 9-B, at 143]. After Walker fired his single shot and Mattingly returned fire with 6 shots from the doorway, Cosgrove stepped over Mattingly and fired 16 more shots into the apartment, one of which hit Taylor in the chest, eventually causing her death. Hankison testified that at Walker's initial shot he immediately ran to the side of the apartment and rapidly fired 5 shots through the sliding glass door, followed immediately by 5 more shots through the bedroom window "basically in succession." [DE 240, Tr. Vol. 10 at 95]. He testified that "less than half a second" elapsed between his two volleys of shots, *id*.at 94–96, and that as soon as he stopped firing, the other shots also stopped. [DE 222, Tr. Vol. 9-B at 130-31]. Even crediting Hankison's own testimony—that Hankison and Cosgrove shot simultaneously—the 16 shots from Cosgrove and 10 shots from Hankison ended the 10-second period. As a result, there was no break or change in circumstance such that the seizure ended at any point during the incident or that Taylor's freedom of movement was restored.[2] At all times, immediately before and during Hankison's shots, Taylor's freedom of movement was restrained by the officers' show of authority, including Hankison's.

Taylor neither attempted to flee or leave the back of the hallway once the shooting started nor could she, realistically, given the trajectory of the bullets fired by the officers, including those specifically fired by Hankison through the bedroom window. FBI crime scene reconstruction expert Michael Van Arsdale ("Van Arsdale") testified to trajectory diagrams and other scene photographs showing that many of the bullets fired into the apartment would have restricted any movement by Taylor to leave the apartment or flee. And more specifically, Van Arsdale testified

---

[2] Hankison appears to assert that because the jury instructions for Court 1 include the statement that "Brett Hankison fired five shots through a bedroom (J.P.'s) window," [DE 253 at 13582], this somehow means that "Mr. Hankinson's first volley of shots fired into the sliding glass door have nothing to do with count one." [*Id.* at 1352-83]. This is simply untrue. While the jury instructions specifically identify the "use of force" that is alleged to be unreasonable in each count, that is not the determining factor in whether Taylor was "seized" at the time of the alleged unreasonable use of force.

that two of Hankison's bullets crossed through or into the back of the hallway, directly over where Taylor's body was ultimately located. [DE 212, Tr. Vol. 6-B, at 37–46 & 49–50; Gov't Exs. 18, 21, 42, 67, 102, 112, 121, 122, 128, 129, 140 & 144]. This testimony was also supported by Sergeant Jason Vance, the lead crime scene investigator, who also testified regarding the recovery of Hankinson's bullets and where they were located in Taylor's apartment. [DE 211, Vol. 6-A, at 51–54; Gov't Exs. 42, 43, 51, 65, 67]. As a result, the jury heard ample evidence from which a reasonable juror could conclude that Hankison's shots alone restrained Ms. Taylor's movement and seized her—regardless of whether she had already been seized by shots fired from the front door. *Campbell*, 47 F.4th at 478–79.

"When an officer fires a gun at a person," but "the bullet does not hit the person, the 'show of authority . . . ha[s] the intended effect of contributing to [the person]'s immediate restraint' and under our caselaw is a seizure." *Jacobs v. Alam*, 915 F.3d 1028, 1042 (6th Cir. 2019) (alterations in original) (quoting *Thompson*, 831 F.3d at 371); *Floyd*, 518 F.3d at 405–06 (rejecting officer's argument he could not have violated a citizen's Fourth Amendment rights by shooting at and missing the citizen); *see also Rodriguez v. Passinault*, 637 F.3d 675, 687 (6th Cir. 2011) (citations omitted) (stating that it "goes against established law" to believe that a citizen cannot "maintain an excessive force/unreasonable seizure Fourth Amendment claim without having been shot"). By firing through the doorway of Taylor's apartment, officers made a show of authority. Further, Hankison made a show of authority by firing through the glass sliding door and bedroom window. The show of authority by both the officers in the doorway and by Hankison on the side of the apartment, restricted Taylor's freedom of movement such that a reasonable person, under these circumstances, would not feel free to leave. Therefore, the officers, including Hankison, seized

9

Taylor under the Fourth Amendment. *Campbell*, 47 F.4th at 479. And the evidence was sufficient for a jury to conclude, beyond a reasonable doubt, that Taylor was seized.

> **B. The evidence was sufficient for a jury to conclude, beyond a reasonable doubt, that Breonna Taylor was alive.**

Hankison asserts that "the Government failed to prove beyond a reasonable doubt that [] Hankison's two bullets [fired through the bedroom window and which crossed into the hallway where Taylor was located] were fired while Ms. Taylor was alive . . ." [DE 253 at 13528]. He alleges that the United States failed to produce any evidence that Taylor was alive when the two shots were fired and thus, acquittal on Count 1 is appropriate. The government asserts the opposite arguing (1) that sufficient evidence existed in the record to prove she was alive when Hankison fired, and (2) that Hankison's arguments are "inconsistent with his own theory of defense from trial—that he fired at the same time as Cosgrove (who's bullet killed []Taylor), because he mistook Cosgrove's muzzle flashes for shots fired by a suspect inside [] Taylor's home." [DE 258 at 13700].

An individual's civil rights may only be violated while that person is alive. *Love v. Bolinger*, 927 F. Supp. 1131, 1136 (S.D. Ind. 1996). "After death, one is no longer a person within our constitutional and statutory framework, and has no rights of which [s]he may be deprived." *Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir. 1979); *Hillspring Health Care Ctr., LLC v. Dungey*, No. 1:17-CV-35, 2018 WL 287954, at *9 (S.D. Ohio Jan. 4, 2018). As a result, there must be sufficient proof in the record from which a reasonable juror could find this element of the crime proved beyond a reasonable doubt.

Hankison affirmatively asserts that the United States failed present direct evidence that Taylor was alive at the time Hankison shot through the bedroom windows, and this Court agrees. However, it is unreasonable, if not impossible, to require an expert to determine the exact second

that Taylor died, and that is what would be required, identification of the moment her heart and breath ceased within a window of less than 10 seconds. But that is not what the law requires. Circumstantial evidence, if a jury believes it, is sufficient to find this element. *United States v. Adams*, No. 3:24-CR-14, 2024 WL 4932510, at *3 (N.D. Ohio Dec. 2, 2024); *United States v. Wright*, 774 F.3d 1085, 1092 (6th Cir. 2014). Moreover, "such [circumstantial] evidence need not 'remove every reasonable hypothesis except that of guilt.'" *Ellzey*, 874 F.2d at 328 (quoting *United States v. Stone,* 748 F.2d 361, 363 (6th Cir. 1984)). And Rule 29 requires that "all reasonable inferences" be drawn in the government's favor. *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). While Hankison may disagree with the inferences the government contends a juror could draw from the circumstantial evidence, he fails to show those inferences could not reasonably be drawn by the jurors on this element of crime from the evidence presented at trial. *Adams*, No. 3:24-CR-14, 2024 WL 4932510, at *3.

As set forth above, the entire incident took place in a mere 10 seconds. [DE 222, Tr. Vol. 9-B, at 143]. Hankison's own testimony at trial was that he shot through the sliding glass doors and bedroom window at muzzle flashes he believed to be from a suspect's weapon. [*Id.* at 124-131]. At trial, Hankison agreed that these flashes were from other officer's weapons, not Walker's weapon and who only fired one initial shot. [DE 240, Tr. Vol. 10 at 7-8]. For Hankison to be firing at muzzle flashes, the other officers–Mattingly first and then Cosgrove–must have still been firing their weapons when Hankison fired his shots through the sliding glass door and bedroom window. The testimony at trial was that while Mattingly did hit Taylor with his gunfire, it was the bullet fired seconds later from Cosgrove that was fatal. [DE 200, Tr. Vol 5-A at 73]. There was no testimony that her death was instantaneous. As a result, based on the sequence of shots alone, a reasonable juror could infer that her death was not instantaneous, that it took some time (at least a

11

few seconds) for Taylor to die, and that she was still alive when Hankison began firing through the bedroom window.

Additionally, there was the 911 call placed by Walker several minutes after the shooting ceased. [Gov't Ex. 1]. While the audio is unclear, with Walker's voice distressed, quickened, and his speech interrupted by his own cries and wails, a reasonable juror could interpret Walker as telling Taylor to "breathe" twice during the call. [DE 218, Tr. Vol. 8- B at 3]. While Walker's statements could mean that she was not breathing and he was encouraging her to try, it could also just as reasonably mean that she was struggling to breathe, and he was encouraging her to continue. A juror could interpret the call either way and make their own inferences. The Court finds both inferences reasonable. Moreover, even if not breathing, the call alone does not necessarily establish that she was deceased when the call was made or, more importantly, establish that she was deceased at the time Hankison shot through the bedroom window.[3]

The jury also heard testimony from the neighbor in the adjoining apartment, Cody Etherton, that when the gunfire stopped, he heard Walker encouraging Taylor to "breathe," telling her, "breathe, baby, breathe." [DE 215, Tr. Vol. 7-B at 140]. And finally, Detective Nobles testified that he heard a woman's scream from Taylor's apartment after the shooting stopped. [DE 240, Tr. Vol. 10, at 181]. While opposing counsel crossed Nobles on whether he was sure it was woman or not, this is a credibility determination that was in the purview of the jury, not one the Court can consider in a Rule 29 motion.

---

[3] Counsel also asserted that Walker did not say "breathe," but instead "Bre," referring to Walker's nickname for Taylor. Again, while a possible interpretation of the call, it does not foreclose on the reasonableness of other interpretations, the inferences the jury was entitled to draw from the evidence, or definitively establish Taylor's death prior to Hankison's shots through the bedroom window.

In sum, drawing all inferences in a light most favorable to the United States, there was sufficient circumstantial evidence from which the jury did reasonably conclude that Taylor was alive when Hankison fired the first of five bullets through the bedroom window.

### III.    CONCLUSION

For the reasons stated above, and the Court being otherwise sufficiently advised, Hankison's motion for acquittal [DE 253] is **DENIED**.

*Rebecca Grady Jennings, District Judge*
*United States District Court*

February 19, 2025

cc: counsel of record