UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:22-CR-84-RGJ |
| | ) | |
| BRETT KRISTOFER HANKISON, | ) | [18 U.S.C. § 242] |
| | ) | |
| Defendant. | ) | |
| | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

On March 13, 2020, Breonna Taylor was tragically shot and killed by Louisville Metro Police Department ("LMPD") officers executing a search warrant on her home. Although he was part of the team executing the warrant, Defendant Hankison did not shoot Ms. Taylor and is not otherwise responsible for her death. Defendant Hankison did not wound her or anyone else at the scene that day, although he did discharge his duty weapon ten times blindly into Ms. Taylor's home. Defendant Hankison did so only after one of his fellow officers had been shot by Ms. Taylor's boyfriend ("K.W."), who fired at the officer after police breached the door to the home. In September 2020, the Commonwealth of Kentucky obtained an indictment charging Defendant Hankison with three counts of felony wanton endangerment in violation of state law for firing shots that entered the apartment of Ms. Taylor's neighbors. After a lengthy trial in March 2022, in which state prosecutors called approximately 26 witnesses, a jury acquitted Defendant Hankison on all counts.

1

Five months later, on August 3, 2022, under the leadership of Attorney General Merrick Garland, the United States sought and obtained a federal indictment against Defendant Hankison charging him with two counts pursuant to 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law). Both counts arose from the same nucleus of facts: believing the officers were under attack, Defendant Hankison ran to the side of the apartment unit and fired blindly into Ms. Taylor's home, first through a patio door and then again through an adjacent bedroom window. Again, none of those shots wounded anyone. After a recent review of many § 242 cases, counsel is unaware of another prosecution in which a police officer has been charged with depriving the rights of another person under the Fourth Amendment for returning fire and not injuring anyone. Perhaps coincidentally, in this case, two federal trials were ultimately necessary to obtain a unanimous verdict of guilt. But even then, the jury convicted on only one count, despite the fact that the elements of the charge and underlying conduct are essentially the same. The first trial commenced in or around October 2023, but concluded with a declaration of a mistrial in November 2023 because that jury could not reach a verdict on either count. Eleven months later, in October 2024, the government tried again, in what was Defendant Hankison's *third trial* arising from the same conduct. Finally, on November 1, 2024, after a two-week trial, a jury found defendant guilty of just one of the two counts charging him with deprivation of rights under color of law pursuant to 18 U.S.C. § 242.

Given this conviction, the Court must now impose a sentence that is "sufficient, but not greater than necessary," to satisfy all of the sentencing objectives set forth in 18 U.S.C. § 3553(a). Like the Court, this is not an imposition the Department of Justice takes lightly. The government respects the jury's guilty verdict as the unanimous judgment of a group of Defendant Hankison's peers that he is guilty beyond a reasonable doubt of every

element of the crime of conviction. The jury's role as "the great bulwark of our civil and political liberties" warrants this respect. *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (quoting 2 J. Story, Commentaries on the Constitution of the United States, 540-41 (4th ed. 1873)). Far from a "mere procedural formality," the right to a jury trial is "a fundamental reservation of power in our constitutional structure" that ensures "the people's ultimate control" in the justice system, in the same way that "suffrage ensures [their] ultimate control in the legislative and executive branches." *Blakely v. Washington*, 542 U.S. 296, 305-06 (2004). The jury's guilty verdict shifts Defendant Hankison from accused and presumed innocent to convicted and subject to appropriate punishment. And in Defendant Hankison's case, the jury's verdict will almost certainly ensure that Defendant Hankison never serves as a law enforcement officer again and will also likely ensure that he never legally possesses a firearm again. But for a jury verdict in this case the government might proceed differently.

Complicating this Court's duty to sentence Defendant Hankison, however, is the obligation that the Court consider and correctly apply the United States Sentencing Guidelines ("U.S.S.G."). Put simply, the Guidelines do not fairly apply to a charge under § 242 involving the unique facts and circumstances of this case. Accordingly, the United States respectfully recommends that the Court grant a significant downward departure and *Booker* variance pursuant to 18 U.S.C. § 3553(a).[1] *See United States v. Booker*, 543 U.S. 220, 245 (2005). Moreover,

---

[1] The government is aware that the Court's standing order requires objections to the PSR's Guideline calculations to be filed no later than 35 days before the sentencing hearing, but that later objections are permitted under a showing of good cause. Mem. and Order at 3, 5 (Nov. 8, 2024) (ECF No. 251). In this case, the "good cause" is that further scrutiny of the issue and extensive legal research has led the government to reconsider the PSR's determination of the Base Offense Level. First and foremost, *Booker* requires that the district court correctly

3

even when the Pre-Sentence Report's Guideline calculations are corrected, the Guidelines' advisory sentencing range is still excessive. Under a correct analysis, the Total Offense Level is 25, and the Criminal History Category is I, which produces an advisory Guideline range of 57-71 months. As the Court knows, however, the Guidelines are "advisory." *Booker*, 543 U.S. at 245. The Court's charge is to impose a sentence that is "reasonable" in light of the sentencing factors set forth in 18 U.S.C. § 3553(a). *Id*. "[R]easonableness is a range, not a point," and the Guidelines no longer provide the exclusive limit on that range. *United States v. Mohamed*, 459 F.3d 979, 989 (9th Cir. 2006) (affirming sentence notwithstanding "considerable" "deviation from the advisory guidelines" because it was "reasonable on the facts of this case").

## PRE-SENTENCE REPORT

In its Pre-Sentence Report ("PSR"), the United States Probation Office ("USPO") has determined that defendant's offense conduct generates a Total Offense Level of 33 under the Sentencing Guidelines. PSR ¶ 52. The Probation Office also determined that defendant has no prior convictions (either as an adult or a juvenile), which generates zero criminal history points and places him in Criminal History Category I. PSR ¶¶ 54-56. Based on these calculations, the Probation Office concludes that the Guidelines prescribe an advisory sentencing range of 135-168 months' imprisonment, within Zone D of the Guidelines Sentencing Table. PSR ¶ 72.

---

calculate the Guidelines range, and the government submits this objection for the purpose of assisting the Court to achieve that result.

4

## GOVERNMENT'S RESPONSE TO PSR AND DEFENSE BRIEF

### A. Summary of Offense Conduct

The government has *no objection* to the PSR's summary of the facts relating to defendant's offense conduct and the trial testimony of various witnesses. PSR ¶¶ 6-39.

### B. Total Offense Level

The government respectfully *disagrees* with the PSR's calculation of defendant's Total Offense Level under the Sentencing Guidelines: Level 33.

#### 1. Base Offense Level

Although we agree with the PSR's Guideline calculations in all other respects, the government *objects* to PSR ¶ 44 because it relies on a cross-reference to the attempted-murder guideline (U.S.S.G. § 2A2.1(a)(2)) to determine the Base Offense Level under U.S.S.G. § 2H1.1(a)(1). The USPO makes that determination based on the jury's special finding that the offense involved an attempt to kill. PSR ¶ 39. Based on its cross-reference to § 2A2.1(a)(2), the USPO concludes that the Base Offense Level is Level 27. *Id*. As explained below, however, the government submits that the Base Offense Level is Level 19, based on a cross-reference to the aggravated-assault guideline U.S.S.G. § 2A2.2.

In his sentencing memorandum, defendant also objects to PSR ¶ 44 and recommends a Base Offense Level 19, but he does so on different grounds — namely, the contention that "the government lacks sufficient evidence to meet its burden of demonstrating a specific intent to kill" and thus "the cross-reference to U.S.S.G. § 2A2.1 is not applicable." Def. Sentencing Mem. at 2-4 (July 6, 2025) (ECF No. 281). In the government's view, the jury's special finding regarding an attempt to kill forecloses that argument. Indeed, defendant admits as much in his memorandum when he notes that "although a murder may be committed without an intent to kill,

5

an attempt to commit murder requires a specific intent to kill." *Id.* at 3 (citing *United States v. Brooks*, 67 F.4th 1244, 1245 (10th Cir. 2023)). Moreover, as explained below, all of that is beside the point; the dispositive issue is whether defendant's conduct occurred under sudden and extreme provocation which, though not a legal defense, is sufficiently mitigating that it negates malice.

U.S.S.G. § 2H1.1 is the guideline applicable to Offenses Involving Individual Rights, including violations of 18 U.S.C. § 242, and it provides that the Base Offense Level is to be determined by "apply[ing] the greatest" of the following options: "(1) the offense level from the offense guideline applicable to any underlying offense; (2) 12, if the offense involved two or more participants; (3) 10, if the offense involved (A) the use or threat of force against a person, or (B) property damage or the threat of property damage; or (4) 6, otherwise." U.S.S.G. § 2H1.1(a). As to the first option, the Court must look to "the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law." U.S.S.G. § 2H1.1, Application Note 1.

As noted above, the USPO relies on a cross-reference to the guideline for attempted second degree murder (U.S.S.G. § 2A2.1(a)(2)) based on the jury's special finding that the offense involved an attempt to kill. PSR ¶ 44. However, that observation alone does not end the analysis. The notes to § 2A2.1 provide as follows: "This section applies to the offenses of assault with intent to commit murder and attempted murder. An attempted manslaughter, or assault with intent to commit manslaughter, is covered under § 2A2.2 (Aggravated Assault)." U.S.S.G. § 2A2.1, "Background" Note. Thus, the Court must consider which guideline is most "applicable" to the defendant's offense conduct in violation of 18 U.S.C. § 242. The question is

6

whether, in light of all the evidence, defendant's offense conduct is more aptly characterized as an attempted murder or an attempted voluntary manslaughter.

"Murder is the unlawful killing of a human being with malice aforethought," while "[m]anslaughter is the unlawful killing of a human being without malice." 18 U.S.C. §§ 1111(a) and 1112(a); *United States v. Conaster*, 514 F.3d 508, 523 (6th Cir. 2008) (summarizing difference between two crimes as part of Guidelines analysis in § 242 case). Even if a defendant kills another person with the mental state required for murder — *i.e.*, malice, that is an intent to kill or extreme recklessness — the malice is negated and the offense downgraded to voluntary manslaughter when it is provoked "upon a sudden quarrel or heat of passion." *See* 18 U.S.C. § 1112 (defining voluntary manslaughter as the "unlawful killing of a person, without malice" "upon a sudden quarrel or heat of passion"); *see also United States v. Kechego*, 91 F.4th 845, 853 (6th Cir. 2024) (citing 18 U.S.C. § 1112); *United States v. Roston*, 986 F.2d 1287, 1291 (9th Cir. 1993) (holding that circumstances showing that defendant acted under heat of passion negated presence of malice); *see generally* W. LaFave, Criminal Law, §§ 15.1-15.3 (6th ed. 2017) (surveying the law in various jurisdictions).

"[A] defendant's 'heat of passion' must arise from 'adequate provocation.'" *United States v. Slager*, 912 F.3d 224, 235 (4th Cir. 2019) (quoting *United States v. Martinez*, 988 F.2d 685, 694 (7th Cir. 1993), and *United States v. Roston*, 986 F.2d 1287, 1291 (9th Cir. 1993)). "Provocation is adequate when it 'would arouse a reasonable and ordinary person to kill someone.'" *Slager*, 912 F.3d at 236 (citations omitted). "When a law enforcement officer, like defendant, seeks to rely on a sudden quarrel or heat of passion defense, a court must assess the adequacy of the provocation 'by the standards of a reasonable officer.'" *Slager*, 912 F.3d at 236 (quoting *United States v. Velazquez*, 246 F.3d 204, 213 (2d Cir. 2001)).

7

In *Slager*, the district court held that "a cross-reference [to] voluntary manslaughter can be *consistent* with a § 242 violation," although it held the cross reference was not "appropriate" in that case. *United States v. Slager*, 2018 WL 445497, *8 (D.S.C. 2018) (emphasis in original). The Fourth Circuit's analysis of the Guideline issue in *Slager* tacitly accepted the district court's conclusion on that point. *Slager*, 912 F.3d at 235-37.

Thus, the issue here under the Sentencing Guidelines is whether the circumstances that defendant faced on the day in question — though not providing a complete legal defense to the § 242 charge — constitutes the type of provocation that would arouse a reasonable police officer to attempt to kill another person (illegally) and thus mitigates the seriousness of his misconduct and effectively negates "malice." It clearly is. Here, defendant observed fellow officers come under fire unexpectedly from an unknown suspect located within Ms. Taylor's apartment. One of those officers was wounded in the leg and fell to the ground. PSR ¶ 14. It was dark, and, from their positions directly in front of the open door, Sgt. J.M. and Det. M.C. both testified to seeing muzzle flashes during the exchange of gunfire with K.W., all but one of which would have come from their own guns. PSR ¶¶ 14-17. Both of them fired multiple rounds into the apartment in response to the boyfriend shooting at them. *Id*. Two of those rounds went through the ceiling and into the apartment above them. PSR ¶ 26. No audio or video recording of the incident exists to determine how much time elapsed between the other officers' cessation of firing and defendant's first volley of shots. The testimony on that point was also mixed. Sgt. J.M. testified to hearing defendant firing his gun while J.M. was retreating (PSR ¶ 17), and M.C. testified to seeing defendant's muzzle flashes as he and J.M. scrambled away from the front door to safety. PSR ¶ 16. Defendant testified that he commenced firing while the other officers were still shooting — *i.e.*, contemporaneously — and that corroborates his

testimony that he saw muzzle flashes from inside the apartment at the time he opened fire. It is also consistent with his testimony that he fired out of concern for the other officers.

The circumstances in this case differ markedly from those faced by the defendant in *Slager*. Officer Slager faced no serious provocation from the victim-suspect, but he nonetheless shot the suspect, who he knew was unarmed, in the back multiple times as the suspect was running away. *Slager*, 912 F.3d at 235-37. That is not this case. In light of all of the facts in this case, defendant's conduct does not bear even a family resemblance to attempted murder. The conduct occurred in response to a sudden and extreme provocation, which is a mitigating circumstance that (though not a legal defense, per the verdict) negates any finding of malice. Accordingly, the government is satisfied that reliance on the aggravated-assault guideline (U.S.S.G. § 2A2.2) to determine the Base Offense Level under § 2H1.1(a) is not just appropriate, but legally required. Application of the attempted-murder guideline would be legal error.

Under § 2A2.2, the Base Offense Level for an aggravated assault is Level 14. *See* U.S.S.G. § 2A2.2(a). Because defendant discharged a firearm in connection with the offense, the guidelines require the Court to add five-levels. *Id*. § 2A2.2(b)(2)(A). Per § 2H1.1's application notes, that brings the Total Offense Level under § 2A2.2 to Level 19, which then becomes the Base Offense Level under § 2H1.1(a)(1).

### 2. Acceptance of Responsibility

In his sentencing brief, defendant argues that he should receive a three-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. *See* Def. Sentencing Mem. at 4-6 (July 6, 2025) (ECF No. 281). He does not ask for application of the adjustment based on any representation that he has, in fact, accepted responsibility for his offense conduct.

Instead, he argues that he should receive the adjustment because to deny it would essentially punish him for going to trial, in violation of his Sixth Amendment right to trial. *Id*.

The Sixth Circuit has held repeatedly that conditioning the acceptance-of-responsibility reduction under U.S.S.G. § 3E1.1 on a defendant's admission of guilt *does not* penalize the defendant for asserting his privilege against self-incrimination or for exercising his right to trial. *See United States v. Bethune*, 2023 WL 4204532 (6th Cir. 2023) (citing cases and rejecting claim that denial of three-level reduction under § 3E1.1 infringes upon right to trial)*; United States v. Clemons*, 999 F.2d 154, 161 (6th Cir. 1993) (same)); *United States v. Cordell*, 924 F.2d 614, 619 (6th Cir. 1991) (holding that "on its face § 3E1.1 is constitutional" and that it "does not constitute a penalty" for the exercise of a defendant's constitutional right to trial or privilege against self-incrimination).

To be clear, however, if defendant clearly and unequivocally were to admit the wrongfulness of his conduct at or before the imposition of sentence and the Court determined that the admissions were offered in good faith, not just for tactical purposes, the Court would have the discretion to grant a two-level downward adjustment under § 3E1.1(a). *See, e.g., United States v. Ramos–Medina*, 706 F.3d 932, 940 (9th Cir. 2012) ("a defendant who puts the government to its proof may still be eligible for a downward adjustment if, and only if, he has 'otherwise demonstrated sincere contrition'"). In such event, the government would move to apply the two-level reduction.

### C.     Criminal History Category

The government *agrees* with the PSR's calculation of defendant's Criminal History Category under the Sentencing Guidelines: Category I. *See* PSR ¶¶ 54-56. Defendant has no prior convictions and thus has no criminal history points under the Guidelines. *Id.*[2]

### D.     Departures

Like *Booker* variances, departures under the Guidelines are submitted to the Court's broad discretion and are reviewed on appeal for reasonableness. *See United States v. Ellis*, 641 F.3d 411, 421 (9th Cir. 2011) (holding that departures are not reviewed for procedural correctness, but, like variances, whether the deviation from the applicable Guideline range is reasonable). For this reason, the government elects to address defendant's departure arguments as part of its analysis under *Booker* and § 3553(a).

### E.     Supervised Release

#### 1.     Term of Supervised Release

The Court may impose a term of supervised release of no more than five years pursuant to 18 U.S.C. § 3583(b)(1). PSR ¶ 75. Because the offense is a Class A felony, the Guidelines prescribe an advisory range of 2–5 years' supervised release. PSR ¶ 76 (citing U.S.S.G. § 5D1.2(a)(1)). In light of all of the facts of this case, including defendant's lack of prior

---

[2] Under the November 1, 2023 amendments to the Guidelines, a defendant with zero criminal history points would typically be eligible for a two-point reduction to his Total Offense Level. U.S.S.G. § 4C1.1(a) (Nov. 1, 2024 Manual). In this case, however, defendant is not eligible for the "zero-point offender" reduction for at least two independent reasons: (1) the offense of conviction involves the deprivation of individual rights covered by U.S.S.G. § 2H1.1; and (2) defendant possessed a firearm in connection with the offense of conviction. *See* U.S.S.G. § 4C1.1(a)(7), (8).

convictions, no prior drug or alcohol abuse, stable record of gainful employment, and stable family history, the government recommends a *three-year term* of supervised release.

## 2. Conditions of Supervised Release

The government *does not object* to the Probation Office's recommended conditions of supervised release. *See* PSR ¶ 90. Given defendant's lack of prior drug or alcohol abuse, the Court should not impose any drug and alcohol testing conditions.

## GOVERNMENT'S SENTENCING RECOMMENDATION

Based on the foregoing, the Court should adopt the following Guideline calculations to determine the initial, advisory sentencing range:

**Base Offense Level:**

| | | |
|---|---|---|
| Aggravated Assault with discharge of firearm: | 19 | U.S.S.G. § 2H1.1(a)(1); U.S.S.G. § 2A2.2(a), (b)(2) |

**Offense Characteristics**

| | | |
|---|---|---|
| Offense Under Color of Law: | +6 | U.S.S.G. § 2H1.1(b)(1)(B) |

**Adjustments**

| | | |
|---|---|---|
| Obstruction of Justice: | +0 | U.S.S.G. § 3C1.1 |
| Acceptance of Responsibility: | –0 | U.S.S.G. § 3E1.1(a) |
| Zero-Point Offender: | –0 | U.S.S.G. § 4C1.1 |

| | |
|---|---|
| Total Offense Level: | 25 |
| Criminal History Category: | I |
| Term of Imprisonment: | 57-71 months |

Under *Booker*, the calculation of the *advisory* Guidelines range is the first step, and the Court must then consider whether departures under the Guidelines or so-called *Booker* variances

are proper when determining the final sentence under § 3553(a).  *See Gall v. United States*, 552 U.S. 38, 50 (2007) (the sentencing judge "may not presume that the Guidelines range is reasonable," but must instead "make an individualized assessment based on the facts presented").  For the following reasons, the government agrees with defendant that a significant downward departure/variance is warranted based on the Guidelines' departure provisions and based on the government's assessment of the facts of this case under *Booker*.

*First*, the government agrees that a downward departure is warranted pursuant to U.S.S.G. § 5K2.10, which permits a downward departure if a third-party's "wrongful conduct contributed significantly to provoking the offense behavior."  Def. Sentencing Mem. at 6-7 (July 6, 2025) (ECF No. 281).  As defendant explains, "[K.W.]'s firing of his weapon once officers forced their way into the apartment substantially provoked three officers to discharge their own weapons."  *Id*.  Under any fair assessment of the facts of this case, that is obviously true.  K.W.'s conduct, even if assumed to be lawful, provoked defendant's offense conduct.  Although the jury found that the circumstances did not give rise to a complete defense, K.W. indisputably fired on defendant's fellow officers, shooting one in the leg, exposing both officers to a risk of death in the so-called "fatal funnel."

In *Koon v. United States*, 518 U.S. 81, 105 (1996), the Supreme Court approved a departure under § 5K2.10 in a case involving less compelling facts.  There, the Court approved a downward departure for police officers in a § 242 case based on the victim's conduct provoking the officers' offense conduct.  As explained by the Court, "[t]he punishment prescribed by § 2A2.2 contemplates unprovoked assaults, and as a consequence, the district court did not abuse its discretion in departing downward for King's misconduct in provoking the wrong."  *Id*.

13

*Second*, the Supreme Court has held that former police officers are susceptible to assaults and other abuse in prison, and that fact is a valid reason for a downward departure under U.S.S.G. § 5K2.0(a)(1)(A) of the Guidelines.   *See Koon*, 518 U.S. at 106-07 (approving downward departure for susceptibility to abuse for police officers); *see also* U.S.S.G. §5K2.0(a)(1)(A) (authorizing departures from Guideline range to account for aggravating or mitigating circumstances that are not adequately taken into consideration by the Guidelines). As with *Koon*, defendant's general susceptibility to abuse as a law enforcement officer is compounded by the "widespread publicity and emotional outrage" regarding the LMPD's execution of the search warrant on Ms. Taylor's apartment and her resulting death.   *Id*. at 96.

As defendant notes in his sentencing memorandum, there are other cases in which the courts have approved a downward departure on similar grounds.   In *United States v. LaVallee*, 439 F.3d 670, 677, 707-08 (10th Cir. 2006), for example, the Tenth Circuit held that a departure under § 5K2.0 based on the defendant correctional officer's particular susceptibility to abuse in prison was not an abuse of discretion.   Likewise, in *United Stated v. Volpe*, 78 F. Supp. 2d 76 (E.D.N.Y 1999), *affirmed in part, dismissed in part*, 224 F.3d 72 (2nd Cir. 2000), a district court granted a downward departure in an excessive-force case due to the defendant's status as a former police officer and the extensive national publicity surrounding the case, all of which would "expose Volpe to abuse at the hands of other prisoners or segregation to avoid such abuse."   *Id*. at 84.

The same is true here.   The death of Ms. Taylor and the subsequent criticism of the LMPD — and not just defendant's conduct — has generated significant media attention that exposes defendant to a heightened risk of assault while in custody.   In another case from 2020 that engendered substantial media coverage and public concern (*i.e.*, the death of George Floyd),

14

the lead defendant in that case was viciously assaulted with a prison shank and suffered serious wounds while in custody. In light of the circumstances that provoked defendant's offense conduct and the fact that he is not responsible for killing or injuring anyone, a departure on this ground is proper.

*Third*, in *Koon*, the Supreme Court also held that a downward departure is permissible in cases where a defendant is subjected to successive federal prosecution after an unsuccessful bid by state prosecutors to convict the defendant for the same conduct. *See Koon*, 518 U.S. at 112. The Court noted that successive state and federal prosecutions are permissible under our federal system. *Id*. It held, however, that the district court did not abuse its discretion in determining that a "federal conviction following a state acquittal based on the same underlying conduct ... significantly burden[ed] the defendants," and the district court was permitted to take account of the lengthy state trial and emotional toll that both cases had on the defendant. *Id*.

The Supreme Court recently reaffirmed that successive state and federal prosecutions are permissible under the dual-sovereignty exception to the Double Jeopardy Clause, but, from a defendant's perspective, merely being charged in successive cases no doubt inflicts its own emotional and financial toll, where the process itself becomes the punishment. In this case, the successive prosecutions and three trials constitute a significant financial and emotional burden on defendant, and they warrant a downward departure under § 5K2.0 and *Koon*.

In light of the three trials of defendant and the media attention given to each trial, it is no surprise that defendant has suffered from resulting stress and psychological problems, including post-traumatic stress disorder, anxiety, sleeping difficulties, and related conditions. *See* PSR ¶ 66. Accordingly, a departure under § 5K2.0 is permissible on these grounds and should be granted.

Under *Booker* and § 3553(a), it is also clear that a number of factors counsel in favor of a significant downward variance. To be sure, the government acknowledges that its recommended sentence is significantly lower than the advisory Guideline range. But it is a black-letter principle of Fourth Amendment caselaw that an analysis of a police officer's use of force must be "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Here, Defendant Hankison knew that he and his fellow officers had just been fired upon, and one of them had been hit. Although his response in these fraught circumstances was unreasonable given the benefit of hindsight, that unreasonable response did not kill or wound Breonna Taylor, her boyfriend, her neighbors, defendant's fellow officers, or anyone else.

The government is aware of no other prosecution pursuant to 18 U.S.C. § 242 in similar circumstances. Indeed, reasonable minds might disagree as to whether defendant Hankison's conduct constituted a seizure under the Fourth Amendment in the first place. *Compare Campbell v. Cheatham County Sheriff's Dep't*, 47 F.4th 468, 476-79 (6th Cir. 2022), with *id*. at 483-87 (Nalbandian, J., dissenting) (discussing, *e.g., Torres v. Madrid*, 592 U.S. 306 (2021)). And reasonable minds certainly might disagree whether, even if Defendant Hankison's conduct did constitute a seizure, a prosecution under this statute should have been brought under these circumstances at all.

Here, multiple prosecutions against defendant Hankison were brought, and only one of three juries — the last one — found him guilty on these facts, and then only on one charge. The government respects the jury's verdict, which will almost certainly ensure that defendant

16

Hankison never serves as a law enforcement officer again and will also likely ensure that he never legally possesses a firearm again.

But adding on top of those consequences a sentence within the lengthy Guidelines range — even when properly calculated — would, in the government's view, simply be unjust under these circumstances. For the reasons explained in this memorandum, the government requests a downward variance and a sentence of time served (one day's imprisonment), followed by three years of supervised release. A three-year term of supervised release is subject to conditions that constitute substantial limits on any defendant's liberty. *See Gall*, 552 U.S. at 48 (noting that sentences of probation, which are like terms of supervised release, are "subject to several standard conditions that substantially restrict [defendants'] liberty").

*Finally*, under § 3553(a), the Court must consider defendant's personal history and characteristics, all of which make clear that there is no need for a prison sentence to protect the public from defendant or to provide "just" punishment or deterrence. As to this factor, the PSR makes clear that defendant has no prior convictions, either as an adult or a juvenile. PSR ¶¶ 54-59. He has maintained stable employment throughout his adult life. PSR ¶¶ 68-69. He has performed well on pre-trial release for over four years during the pendency of his state and federal cases, with no reported violations. All of these factors are relevant under § 3553(a) because they demonstrate that there is no need for a prison sentence to protect the public from defendant.

In accordance with § 3553(a), the government hereby recommends that the Court impose the following sentence on defendant Hankison: (1) one-day of imprisonment, which is time-served as defendant gets credit for the day he was booked and made his initial appearance before the Court in this case; (2) a three-year term of supervised release subject to any and all

mandatory, standard, and special conditions as the Court deems reasonably related to, and necessary to secure, all of the goals of sentencing set forth in 18 U.S.C. § 3583(d); (3) a mandatory special assessment of $100; and (4) defendant shall cooperate in the collection of a DNA sample from the defendant. On the unique facts of this case, the government believes that this sentence is sufficient, but not greater than necessary, to achieve all of the statutory goals of sentencing.

DATE: July 16, 2025                              Respectfully submitted,

                                                 HARMEET K. DHILLON
                                                 Assistant Attorney General

                                                     */s/ Robert J. Keenan*
                                                 _____
                                                 Robert J. Keenan
                                                 Senior Counsel
                                                 Civil Rights Division
                                                 U.S. Department of Justice
                                                 950 Pennsylvania Avenue, NW
                                                 Washington, DC 20530
                                                 (202) 305-2566
                                                 Robert.Keenan@usdoj.gov

                                                 Authority Conferred by 28 U.S.C. § 515

## **CERTIFICATE OF SERVICE**

      I hereby certify that, on July 16, 2025, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a Notice of Electronic Filing to all parties.

                                        */s/ Robert J. Keenan*

                                        Robert J. Keenan
                                        Civil Rights Division