UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                    Plaintiff

v.                                                    Criminal Action No. 3:22-cr-84-RGJ

BRETT HANKISON                                                              Defendant

* * * * *

**MEMORANDUM OPINION AND ORDER**

Defendant Brett Hankison was charged with two counts of deprivation of rights under color of law. *See* 18 U.S.C. § 242. The Court conducted a jury trial October 15, 2024 through November 1, 2024. [DE 251 at 13571]. After receiving a partial verdict instruction, the jury delivered a unanimous verdict of not guilty as to Count 2 of the Indictment and, after additional deliberations, the jury delivered a unanimous verdict of guilty as to Count 1 of the Indictment. [*Id.* at 13572]. Having already moved for acquittal and leave to interview jurors on unrelated grounds, Hankison now moves for "reversal of his conviction as to Court 1, and a new trial regarding same in the interest of justice" under Federal Rule of Criminal Procedure ("Rule") 33(a) and (b)(2) urging the Court to find prosecutorial misconduct throughout trial. [DE 254 at 13587]. While the allegations of prosecutorial misconduct are not specific to the elements of Count 1, Hankison does not allege any wrongdoing as to the verdict on Count 2. [*Id.* at 13587-91]. The United States responded [DE 260] and Hankison replied [DE 265]. Both parties move for leave to exceed page limits [DE 259; DE 264], which the Court previously granted [DE 267; DE 268]. Hankison also moves for leave

1

to file supplemental authority [DE 269], to which the United States has not responded.[1] For the reasons below, Defendant's motion for leave to file supplemental authority [DE 269] is **GRANTED** and Defendant's motion for new trial [DE 254] is **DENIED**.

## I.    STANDARD

Rule 33 provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting Rule 33(a)). Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred. *United States v. Whittle*, 223 F. Supp. 3d 671, 675 (W.D. Ky. 2016), *aff'd*, 713 F. App'x 457 (6th Cir. 2017) (citing *Munoz*, 605 F.3d at 373); *see also United States v. Hawkins*, 2023 WL 3244567, at *12 (E.D. Ky. May 4, 2023), *aff'd*, No. 23-5479, 2024 WL 1956214 (6th Cir. May 3, 2024) (citing *United States v. Duerson*, 2022 WL 5199724, at *1 (E.D. Ky. Oct. 5, 2022)). "[S]uch motions should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993); *see also United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (Rule 33 motions "are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." (citation and quotation omitted)).

The court may grant a new trial on one of two grounds: (1) newly discovered evidence under Rule 33(b)(1); or (2) a motion "grounded on any reason other than newly discovered

---

[1] Hankison seeks to supplement a single case, *United States v. Acosta*, 924 F.3d 288, 302 (6th Cir. 2019). Hankison states supplement should be permitted because "[t]his case is pertinent and significant to the motion at issue because it is controlling." [DE 269 at 13895]. Supplementation is typically permitted only where the case is new and decided after the parties brief has been filed. Here, *Acosta* was decided years ago, in 2019, and it is unclear why this case would not have already been cited to the Court in the course of brief. However, there is no reason not to permit supplementation as the Court has already considered this case in its independent research. *Clemons v. United States*, 2017 WL 1030725, at *4 (W.D. Tenn. Mar. 15, 2017).

evidence" under Rule 33(b)(2). Fed. R. Cr. P. 33. The burden is on the defendant to justify a new trial. *See United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009). If the motion seeks a new trial based on a challenge to the weight of the evidence, the Court may assess both the credibility of the witnesses and the weight of the evidence, acting as the "thirteenth juror." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). Here, Hankison's motion lies under Rule 33(b)(2) for allegations of prosecutorial misconduct in both conduct and remarks. The motion does not appear to challenge the weight of the evidence for conviction, only the impropriety of the conduct and statements of the prosecutors.[2]

The Court analyzes claims of prosecutorial misconduct in two steps. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (applying the two-step approach and the 4 factors to prosecutorial "conduct and remarks"). The Court first considers "whether the prosecutor's statements [or conduct] were improper." *United States v. Hall*, 97 F.3d 1107, 1119 (6th Cir. 2020) (citing *Carter*, 236 F.3d at 783); *Boyle v. Million,* 201 F.3d 711, 717 (6th Cir. 2000); *see also United States v. Singleton*, 2018 WL 5075982, at *41 (E.D. Ky. Mar. 20, 2018), *report and recommendation adopted*, 2018 WL 8949240 (E.D. Ky. Oct. 17, 2018) (quoting *Washington v. Hofbauer*, 228 F.3d 689, 698-99 (6th Cir. 2000)) ("In the context of 'conduct,' rather than a 'statement,' Singleton must show that the 'prosecutor's conduct was plainly improper.'"). If so, the Court must "consider and weigh four factors in determining whether the impropriety was flagrant." *United States v. Warshak*, 631 F.3d 266, 302 (6th Cir. 2010) (citing *United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994)); *Hofbauer*, 228 F.3d 699-700 (noting that the

---

[2] Hankison's motion, in its "Standard of Review" encourages the Court to act as a "thirteenth juror" in considering his motion. [DE 254 at 13591]. Yet, the motion does not seek a new trial based on a challenge to the weight of the evidence of conviction. The motion appears entirely focused on prosecutorial misconduct. As a result, the Court reviews the claims under the two-step prosecutorial misconduct analysis and only weighs the strength of the evidence to the extent necessary to determine flagrancy.

3

prejudice / flagrancy analysis for conduct mirrors that applicable to remarks). Specifically, the Court must consider "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudiced the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.* "Flagrancy turns on content and context." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009).[3]

The parties agree that Hankison's counsel failed to object during trial to either the prosecutor's remarks or the elicited testimony.  [DE 254 at 13592; DE 260 at 13758]. As a result, this Court reviews Hankison's prosecutorial misconduct claims for plain error.[4] *See United States v. Henry*, 545 F.3d 367, 376–77 (6th Cir. 2008) (citing *United States v. Emuegbunam,* 268 F.3d 377, 406 (6th Cir. 2001)); Fed. R. Crim. P. 52(b). Plain-error review requires the Court to determine whether

---

[3] If the statements or conduct were improper but not flagrant, a new trial may still be warranted if "(1) 'proof of [Defendant's] guilt was not overwhelming,' (2) '[Defendant] objected to the improper remarks [or conduct],' and (3) 'the court failed to cure the error with an admonishment to the jury.'" *Hall*, 979 at 1119 (citing *Carroll*, 26 F.3d at 1390). Here, because the Defendant did not object to the statements or conduct at issue in this motion [DE 254 at 13592; DE 260 at 13758], there can be no "nonflagrant" statements or conduct, but instead the Court analyzes the flagrant errors under a plain error standard.  *See infra.*

[4] "The plain-error doctrine of Federal Rule of Criminal Procedure 52(b) tempers the blow of a rigid application of the contemporaneous-objection requirement." *United States v. Young*, 470 U.S. 1, 15 (1985). The Rule authorizes only the correction of "particularly egregious errors," *United States v. Frady,* 456 U.S. 152, 163 (1982), that "seriously affect the fairness, integrity or public reputation of judicial proceedings," *United States v. Atkinson,* 297 U.S., at 160. As a result, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Frady*, 456 U.S. at 163, n. 14. "Any unwarranted extension of this exacting definition of plain error would skew the Rule's 'careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.'" *Young*, 470 U.S. at 16 (quoting *Frady,* 456 U.S. at 163 (footnote omitted)).

(1) an error occurred []; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

*Emuegbunam,* 268 F.3d at 406. "Error is defined as '[d]eviation from a legal rule . . . unless the rule has been waived,' and waiver is defined as the 'intentional relinquishment or abandonment of a known right.'" *Carter*, 236 F.3d at 783–84 (quoting *United States v. Olano,* 507 U.S. 725, 733 (1993)). For a defendant to establish that the plain error affected his substantial rights "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano,* 507 U.S. 725, 734. As the Sixth Circuit has recognized, "prosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it." *Carroll,* 26 F.3d at 1385 n. 6. But "[o]nly in exceptional circumstances" will a court reverse a conviction under the plain-error standard." *Id.*; *see also United States v. Pires*, 642 F.3d 1, 14 (1st Cir. 2011) (quoting *United States v. Mejia–Lozano*, 829 F.2d 268, 274 (1st Cir.1987)). ("We will intervene only if a statement 'so poisoned the well that the trial's outcome was likely affected.'"). When determining whether alleged prosecutorial errors "sink to the level of plain error, [the Court] evaluate[s] the statements within the context of the case as a whole." *Id.* (citing *United States v. Morales–Cartagena,* 987 F.2d 849, 854 (1st Cir.1993)).

In the alternative, Hankison argues a cumulative error theory. To warrant a new trial under the cumulative error theory "a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). Defendant is not entitled to relief under the cumulative error theory if he only identifies a single harmless error. *Id.* But, in determining whether the substantial rights of the defendant were affected, courts may aggregate all alleged errors, under the

cumulative effect doctrine, to determine if together any harmless errors are no longer harmless, making it necessary for a new trial to be granted. *United States v. Bowen*, 969 F. Supp. 2d 546, 574 (E.D. La. 2013) (citing *United States v. Barrett,* 496 F.3d 1079, 1121 (10th Cir. 2007)). The "cumulative error analysis[, however,] only applies to errors, not non-errors." *United States v. Chaney*, 211 F. Supp. 3d 960, 994 (E.D. Ky. 2016), *aff'd*, 921 F.3d 572 (6th Cir. 2019) (quoting *United States v. Anderson*, 488 F. App'x. 72, 80 (6th Cir. 2012)).

"The decision to grant or deny a motion for a new trial is entirely within the discretion of the district court, and [the Sixth Circuit] will not reverse absent a showing of an abuse of discretion." *United States v. Anderson*, 76 F.3d 685, 692 (6th Cir. 1996); *see also United States v. Farrad*, 895 F.3d 859, 885 (6th Cir. 2018); *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015).

## II. ANALYSIS

Hankison's motion asserts the United States made "a variety of improper arguments/ comments over the course of trial, which amount to flagrant misconduct and necessitate a reversal of his conviction as to Count 1, and a new trial regarding same in the interest of justice." [DE 254 at 13587]. "In the alternative, Defendant seeks the same relief based on the cumulative effect of the improper remarks made throughout the course of the trial which amount to non-flagrant misconduct that necessitates a reversal of the conviction as to Count 1, and a new trial…" [*Id.* at 13587-88].

As an initial matter, the Court is frustrated by the nebulous and disjointed nature of the motion and corresponding briefs. The Court finds it difficult to parse the specific claims of misconduct from the motion. This appears to be a circumstance of throwing everything possible at the Court and seeing what sticks. In some instances, arguments appear asserted in the factual

background but not substantially revisited in the argument section [DE 254 at 13589-90], while in other instances the heading states one argument, while the substance under the heading states another [*Id.* at 13597-02]. In many instances, the motion simply lists block quotes from the prosecutor's closing argument, with no explanation or analysis of why that particular excerpt is objectionable. [*Id.* at 13596-97]. On the first page of the reply brief, Hankison states: "The instant Motion sufficiently established prosecutors deprived Defendant of due process by: (1) (2); and (3)," as if imploring the Court to find some depravation of rights in the kitchen sink inclusive list of wrongs committed by the prosecution. [DE 265 at 13785]. As the United States Court of Appeals for the Seventh Circuit has infamously stated, "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam); *see also Codrington v. Dolak*, No. 24-5831, 2025 WL 1892818, at *8 (6th Cir. July 9, 2025) (noting its approval of this Seventh Circuit philosophy); *Dean-Lis v. McHugh*, 598 F. App'x 412, 415 (6th Cir. 2015) (also citing the Seventh Circuit quote with approval). "Mere allusion or reference is not enough; the issue must actually be raised with a minimum level of thoroughness." *Seifert v. Pa. Hum. Relations Comm'n*, 301 F. App'x 194, 196-97 (3d Cir. 2008); *see also United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) citing *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir.1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Here, several of the arguments are simply not raised with an appropriate level of thoroughness. Moreover, while it appears the United States attempted to keep headings and arguments consistent in its response, the disjointed nature of the motion has made this difficult to follow.

The Court finds that Hankison's motion appears to assert six arguments that the testimony elicited by the United States during trial or the prosecutor's statements in closing argument were improper. First, Hankison objects to the prosecutor's conduct in eliciting testimony from several officer witnesses who, "without personal knowledge of the defendant's shooting," "opin[ed] about whether the defendant acted in accordance with LMPD policies and training." [*Id.* at 13589]. Hankison alleges that the prosecution agreed pretrial that (1) except for Myles Cosgrove, "lay witnesses without personal knowledge of the defendant's shooting may not opine about whether the defendant acted in accordance with LMPD policies and training;" and (2) "No witness—lay or expert—may offer opinions regarding whether the defendant's force met applicable legal standards, such as whether it was 'reasonable' under the Fourth Amendment or analogous conclusions such as whether the force was 'lawful,' 'justified,' or 'appropriate.'" *Id.* Hankison alleges the prosecutor's conduct improperly elicited testimony violating this agreement. This argument is primarily found in the "Statement of Fact" section and focuses on the Court's instructions in the pretrial order.

Second, as the first heading in the "Argument," Hankison asserts that the prosecutor improperly commented or litigated in the closing argument whether "other officers involved should have shot or not." [DE 13593-95]. This argument focuses on the Court's instructions during trial as to issues that were not properly before the jury.

Third, Hankison asserts that the prosecutor engaged in "improper vouching" during closing arguments. Fourth, Hankison argues that the prosecutor made "improper attacks of [sic] the defendant's credibility not based on evidence or facts before the jury," [DE 254 at 13597-02], yet most of the objections allege that the prosecutor's statements were misleading. Fifth, Hankison argues that the prosecutor made improper appeals to the jury to act as the community conscience.

Finally, Hankison asserts that the prosecutor engaged in improper witness bolstering. [*Id.* at 13605-09]. Specifically, "[d]uring the prosecution's proof, prosecutors elicited testimony from various witnesses regarding information they later discovered/corroborated, without expounding upon the basis of how that information was discovered/corroborated, and without ever introducing the underlying source of that information into evidence." [DE 254 at 13590]. He alleges that "[t]his type of testimony was solicited from at least three government witnesses: Myles Cosgrove, Jason Vance, and Matt Russel." [*Id.*].

The United States disagrees and asserts that none of the testimony elicited, or statements made were objectionable, nor did defense counsel object to any of those statements or the prosecutor's conduct during trial. [DE 260 at 13744]. Further, the United States argues that the prosecution "fairly characterized and properly drew inferences from the strong evidence of the defendant's guilt." [*Id.*]. And, the United States asserts, that "the defense—not the government––made numerous improper remarks during its closing argument, such as appealing to jurors' personal sympathies, asking the jury to acquit because the victims could be compensated by civil litigation, and inexplicably invoking the U.S. presidential election." [*Id.*].

The Court first analyses whether the prosecutor's statements or conduct constitute an error and then the Court reviews whether the error was flagrant. *Carson*, 560 F.3d at 574. If a flagrant error exists, the Court next analyses whether a new trial is warranted under the plain error standard. *United States v. Al-Maliki*, 787 F.3d 784, 795 (6th Cir. 2015).

### A.  Whether the Prosecutor's Statements or Conduct were Improper.

1.  Whether the prosecutor's conduct in eliciting testimony regarding whether the defendant acted in accordance with LMPD policies and training was improper.

Hankison appears to assert this first allegation of improper conduct in the "statement of facts." [DE 254 at 13588-90].  Hankison notes in reply that the United States fails to respond to this issue.[5]  [DE 265 at 13789].

First, Hankison's arguments relate to a pre-trial motion in which he sought to preclude

the government from introducing, referring to, or soliciting testimony from any of its witnesses regarding personal or expert opinions as to whether [sic] the reasonableness/ unreasonableness, appropriateness/ inappropriateness of Defendant's use of deadly force during the incident in question, and/or whether Defendant's use of deadly force amounted to violation of the Louisville Metropolitan Police Department's policies and procedures or training in its case in chief, or during opening and closing arguments in its case in chief, or during opening and closing arguments [sic].

[DE 161 at 5755].

In ruling on this request, this Court addressed three issues raised by Hankison: (1) testimony from other officers regarding the reasonableness of Hankison's actions; (2) testimony from officers who did not personally observe Hankison's use of force and (3) limitations on the prosecution's opening and closing arguments.  As to the reasonableness of Hankison's actions, all parties agreed that "testimony addressing the 'reasonableness' or 'appropriateness' of his actions—in other words, providing legal conclusions for the jury—would be inappropriate" as they encompassed the ultimate issue before the jury.  [DE 189 at 8892 (citing DE 161 at 5755 and DE

---

[5] While Hankison suggests that the failure to respond is "both peculiar, and telling," based on its location in the motion, the Court does not find such significance. [DE 265 at 13789].  This argument was discussed in the statement of facts, but never returned to or discussed in Hankison's analysis.  Instead, it is replaced in the analysis with an argument regarding whether the prosecutor disregarding the Court's admonishment not to discuss whether other officers should have been charged with crimes.  This later argument was not enumerated in the motion's introduction. Regardless, the Court addresses both allegations of error.

174 at 5888]. As to testimony from officers who did not personally observe Hankison's use of force, again the parties agreed "such witnesses 'may not opine' about whether Hankison's actions complied with LMPD policies, procedures or training." [DE 189 at 8892]. However, the United States argued that "'all officer-witnesses may' offer 'testimony about training standards, rooted in personal knowledge,' including how such training would apply in 'circumstances that are similar to' those of this case." [*Id.* at 8892-93 (citing DE 174 at 5889)]. The Court agreed, stating:

> The Court finds nothing problematic with the testimony on these subjects that was admitted at the first trial. Witnesses may testify regarding their personal knowledge of LMPD policies, procedures and training; their personal observations at the scene; or both. *See* Fed. R. Evid. 602. They generally may provide lay opinions that are "rationally based on [their] perception[s]" and "helpful to . . . determining a fact in issue." Fed. R. Evid. 701. The United States contends that one officer, Detective M.C., "witnessed [Hankison]'s shooting and therefore may offer opinions" about whether the shooting "was consistent with deadly force standards." [DE 174 at 5894].

[DE 189 at 8893]. And finally, as to comments in openings and closings, the Court found that Hankison's arguments lacked specificity or legal support and declined to make any preliminary rulings. [*Id.*].

In this current motion, Hankison argues that the United States, despite this pre-trial order, "elicit[ed at trial] the precise type of testimony it agreed would be improper from seven witnesses—counting Myles Cosgrove—including from two individuals who weren't present during the shooting in question, nor were at the scene at any point in time before, during or afterwards. (e.g., Brett Routzahn, Paul Humphrey)." [DE 254 at 13590 (citing to testimony from Routzahn and Humphrey)]. While Hankison states that improper testimony was garnered from "seven witnesses—counting Myles Cosgrove," Hankison only cites to Routzahn's and Humphrey's testimony with any citation or identification. [DE 254 at 13590]. As a result, the

Court analyzes only the testimony of these two witnesses and finds no error or violation of the pre-trial order.

Chief Humphrey gave extensive testimony regarding LMPD policies and procedures including those related to the use of deadly force. [*See generally*, DE 248]. The excerpts challenged by Hankison relate to questions asked of Humphrey regarding use of deadly force in specific situations. Here, the prosecution elicited testimony as to whether actions were consistent with LMPD training and policies to shoot in specific situations. After having Humphrey read Hankison's own prior sworn testimony, documenting Hankison's personal on-scene perceptions on the night in question, Humphrey was asked whether it was consistent with LMPD policy to shoot under the circumstances documented.

> Q. Sir, I'm now going to show you what has been admitted as Exhibit Number 186.[6] You've had a chance to review this previously; is that right?
>
> A. Yes, sir.
>
> Q. And do you understand this to be testimony that Brett Hankison gave under oath in a prior proceeding?
>
> A. Yes, sir.
>
> Q. Could you please read this to us?

---

[6] Several individual exhibits were entered into evidence containing directly quoted testimony of Hankison from the first trial. [DE 211, Trial Tr. Vol. 6-A at 12934, United States Exhibits 178-90]. All were entered without objection.

A. "At the time you fired through this window, could you see an actual person through the window?" The answer was, "I could not." "Okay. Could you even see the silhouette or outline of an actual person?" Answer: I could not. "Could you see any shadows or anyone moving around in that apartment?" Answer: I could not. "Could you see if there was an actual person somewhere in that bedroom?" Answer: I could not. "Could you see if there was an actual person in the hallway that's beyond the bedroom?" "I could not." "Could you see if there was an actual person in the bathroom that was on the other side of that hallway?" Answer: No, sir. "The one where one of your bullets was recovered in the soap dish, right? You couldn't see if anyone was in there?" Answer: Correct. "And even though you couldn't see any of those things, you fired five shots through this covered window, correct?" Answer: I did.

Q. Based on your knowledge of the training and policies at Louisville Police Department, is it consistent to shoot in that situation?

A. No.

Q. Is that a close call?

A. No, it does not sound like it.

Q. Is it consistent with the rules you taught officers and the tactics you taught officers in that ICAT training that we've been talking about today?

A. No.

Q. The one that Brett Hankison took just a few months before the shooting happened?

A. Correct.

[DE 248 at 13373-75; DE 212 at 11913-14 (asking Routzahn about Ex. 186 and asking the same or similar questions.[7])].  Similarly, in respect to Exhibit 187, Humphrey testified:

> Q. We'll now show you Exhibit 187, please, which is also admitted. And, sir, could you please read this one as well?
>
> A. "And, again, with these shots in the bedroom window, you couldn't actually see any person that you were shooting at at the time you pulled your trigger, right?" Answer: Correct. "Even by sort of your own account, you did not have target identification when you fired through this apartment's bedroom window?" Answer: No. I made that target identification at the front door. Question: A number of seconds earlier before you ran around the apartment before you fired through a different window? Answer: Correct. "That's the last time you had target identification?" Answer: When I had left the doorway; yes, sir. "You no longer had target identification when you shot through that bedroom window?" Answer: Correct.
>
> Q. Are officers in the Louisville Police Department allowed to fire their weapon when they don't have target identification?
>
> A. No.
>
> Q. So as the chief of police, and based on your knowledge of the rules and training, what's your reaction to seeing that an officer fired in that situation?
>
> A. My reaction of those statements or my reaction to seeing somebody fired for those statements?
>
> Q. No. I'm sorry. To see him fire a weapon, so just seeing those statements.

---

[7] Q. Is the description of what Brett Hankison saw and firing in that situation what you teach officers to do in your active shooter response training?
A. No, sir.
Q. Based on your knowledge of LMPD's policy and training, what's your reaction to seeing that he shot in that scenario?
A. My reaction would be that was totally inappropriate to fire those rounds if he didn't see anybody. It's—that'sbad.
Q. Why is it bad?
A. Well, as I mentioned earlier—and I can—it's more if. Who's on the other side of those windows that you can't see? And we brought up the school, which—that's one of the main things that we've always trained for because of the kids and innocent people. You don't want to kill an innocent person. And firing as in that statement, you—if you fire like that, it could very well lead to shooting somebody that's innocent. [DE 212 at 11913-14].

A. Oh, it's bad. I don't know why someone would make a decision under those circumstances to shoot their gun. I mean, we're in stressful situations every day. Particularly those of us who have worked in career paths within this profession where we deal with violent criminals and guns on a regular basis. To think that— to think that you would shoot, and then—and there's -- it make—it doesn't make sense to me. While I get that it's stressful, I've never had a partner shot in front of me. I've been around several officer-involved shootings. I've been shot at several times where I couldn't fire back. That's just not a decision you make in that circumstances—in that circumstance given what he said he knew at the time.

Q. First thing you said was, "It's bad." Why is it bad?

A. I mean, he said he didn't know what he was shooting at. That's – it's basic.

Q. And what's the risk of shooting in that situation?

A. You shoot the wrong person, and innocent people die.

[*Id.* at 13375-77].

In both instances, Humphrey is asked about whether the scenario set forth in Hankison's sworn testimony is compliant with LMPD policies and procedures and a specific training that Hankison took a few months before the shooting.  The United States had the burden to show, as an element of the crime, that Hankison's actions were willful, and the jury was permitted to consider, in determining Hankison's state of mind, "whether the defendant had been trained, and whether his actions were consistent or inconsistent with that training." *See* [DE 228, Jury Instructions, at 10883, 10885, 10891]. Thus, it is appropriate for the United States to offer evidence as to whether Defendant's actions were in keeping with LMPD training, policies and procedures as a violation of a policy may help to demonstrate that Hankison acted willfully.

> [A]n officer's training can help inform his state of mind in certain circumstances. If, for example, an officer has been trained that officers should do certain things when confronted with tense situations, and he does those things, the fact that he acted in accordance with his training could make it less likely that he acted willfully . . . And vice versa: If . . . an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully.

*United States v. Bryant*, 528 F. Supp. 3d 814, 818 (M.D. Tenn. 2021) (quoting *United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) (collecting cases)). As a result, the questions asked to Humphrey and Routzahn about whether specific scenarios violated policy were appropriate and relevant as they went directly to an element of the crime charged.

Further, Humphrey's and Routzahn's testimony was based on the evidence, specific sworn testimony. Their testimony was not based on hypotheticals drawn from the prosecutor's imagination, but on exhibits entered in evidence which Hankison never objected to or disputed. In fact, the exhibits mirror Hankison's testimony given at the second trial regarding his perceptions on the night the night in question. What the prosecutor did in the second trial was use Hankison's own sworn statements to create the scenarios regarding training that the officers were asked about. Rather than ask whether his training and LMPD policy would allow an officer to shoot if he did not see an actual person or a silhouette of a person, the prosecutor had the officer read Hankison's description in which he stated he did not see a person or a silhouette and then asked under those circumstances if firing would be in keeping with LMPD policy. This tactic or line of questioning was not available to the prosecution in the first trial because the testimony was not yet available. As a result, the pre-trial order did not consider this line of questioning. When this Court issues a ruling in limine, it is "no more than a preliminary, or advisory, opinion." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994) (citing *United States v. Luce*, 713 F.2d 1236, 1239 (6th Cir. 1983), aff'd, 469 U.S. 38 (1984)). Thus, even where a motion in limine is denied, the Court may

16

return to its previous ruling at trial "for whatever reason it deems appropriate." *Id.* (citing *Luce*, 713 F.2d at 1239). Likewise, the Court has discretion to alter or amend an earlier in limine ruling at trial. *Luce*, 469 U.S. at 41–42. The Court, thus, had the ability to admit the appropriate testimony at trial. Just as importantly, the defense never objected to the exhibits or to the line of questioning during trial.

Moreover, even though the Court did not consider this specific line of questioning in its pre-trial order, the testimony still appears to fit in the Court finding that "[w]itnesses may testify regarding their personal knowledge of LMPD policies, procedures and training; their personal observations at the scene; or both. They generally may provide lay opinions that are "rationally based on [their] perception[s]" and "helpful to . . . determining a fact in issue." [DE 189 at 8893]. The testimony of these officers is rooted in personal knowledge of the training standards and includes "how such training would apply in 'circumstances that are similar to' those of this case." [DE 189 at 8892-93 (citing DE 174 at 5889)]. Here, the testimony encompassed not just circumstances that are similar to those of this case, they are the exact circumstances perceived by the Defendant at the time he shot, in his own words. As such, the was no substantial lack of compliance with the Court's order, and even if there was, the Court had discretion to alter or amend its motion in limine ruling at trial. *Luce*, 469 U.S. at 41–42.

Notably, contrary to Hankison's assertions, these officers are not asked whether the force used was "lawful," "justified," or "appropriate." [DE 265 at 13788]. Because "[t]he excessive-force inquiry is governed by constitutional principles, not police-department regulations," "[a]n officer's compliance with or deviation from departmental policy doesn't determine whether he used excessive force." *Bryant*, 528 F. Supp. 3d at 818 (quoting *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017)). And therefore, does not reach the ultimate issue in the case or invade

the province of the jury.  Here, the jury is entitled to infer "willfulness [] from 'plainly' wrongful conduct, inconsistency between actions and training, and efforts to prevent detection of wrongful behavior," among other things. *Bryant*, 528 F. Supp. 3d at 818 (quoting *United States v. Brown*, 654 F. App'x 896, 910 (10th Cir. 2016)); *see also* [DE 228, Jury Instructions, at 10891]. The witnesses were never asked the ultimate question of whether Hankison's actions were contrary to the legal standard, they were asked if LMPD policy and training would permit an officer to fire under the conditions described in the sworn testimony.

Finally, these officers all testified to both facts and opinions, as denoted in the jury instructions.  [DE 228 at 10906].   Hankison asserts that

> [p]rosecutors improperly asked for opinions from witnesses regarding the appropriateness of Defendant's actions and whether they complied with LMPD Training and Standard Operating Procedure regarding the use of deadly force, despite not having the requisite perception needed to rationally tie their opinions to—prosecutors frequently had the witnesses read off extremely limited snippets of statements made by Defendant, and sought their opinions based solely on that…clearly violat[ing] Federal Rule of Evidence 701.

[DE 265 at 13804].  The Court disagrees. The officer's opinions were based on their personal training and experience with LMPD policies and procedures. They were also based directly on the perception of Hankison as depicted through Hankison's own sworn testimony.  As a result, the officers had the "requisite perception" of the circumstances to apply to their own experience and training to form an opinion about whether the circumstances described by Hankison in his own words would allow them to shoot pursuant to LMPD policy and training.

Moreover, the jury had the tools in the jury instructions to evaluate this type of testimony.

> You have heard the testimony of Myles Cosgrove, Michael Campbell, Brandon Hogan, Paul Humphrey, Dale Massey, Jon Mattingly, Michael Nobles, Brent Routzahn, and Jason Vance who testified to both facts and opinions. Each of these types of testimony should be given the proper weight.

As to the testimony on facts, consider the factors discussed earlier in these instructions for weighing the credibility of witnesses.

As to the testimony on opinions, you do not have to accept these witnesses' opinions. In deciding how much weight to give it, you should consider the witness's qualifications and how he or she reached their conclusions along with the other factors discussed in these instructions for weighing the credibility of witnesses.

Remember that you alone decide how much of a witness's testimony to believe, and how much weight it deserves.

[DE 228 at 10906].  These witnesses were properly identified in the jury instruction as witnesses to both fact and opinions.

The jury instructions also properly instructed that the testimony regarding training was admissible for the limited purpose of determining willfulness.  [DE 228, Jury Instructions at 10904]. The instruction states, in part:

It is, of course, wholly up to you to determine whether the defendant violated any rule or acted in contravention of his training. If you find that he acted in contravention of policies or training, then I caution you that not every instance of inappropriate behavior on the part of a government employee rises to the level of a federal constitutional violation. It is possible for a government employee to violate department policy or act contrary to his training without violating the United States Constitution . . . For this reason, proof that a defendant violated policy or acted contrary to training is relevant to your determination of willfulness, but is not relevant to your determination that the defendant violated a victim's constitutional rights.

[*Id.*]

"When a court instructs a jury to do something, there is a strong presumption that the jury will follow that instruction." *United States v. Starnes*, 552 F. App'x 520, 524 (6th Cir. 2014) (citing *Richardson v. Marsh,* 481 U.S. 200, 206 (1987) ("This accords with the almost invariable assumption of the law that jurors follow their instructions, which we have applied in many varying contexts.") (citations omitted)).  The Court must assume then that the jury used these instructions to properly evaluate the testimony.

Contrary to Hankison's assertions, the citations to the testimony in the record do not offer opinions regarding "whether the defendants force met applicable legal standards such as whether it was "*reasonable*" under the Fourth Amendment or analogous conclusions such as whether the force was '*lawful*,' '*justified*,' or '***appropriate***.'" [DE 265 at 13788 (emphasis in original)].  As a result and for all the reasons stated *supra*, they do not constitute improperly elicited testimony and were not in violation of the Court's pre-trial order.

> 2. <u>Whether the prosecutor improperly disregarded the Court's instruction to avoid commenting or litigating whether other officers involved should have been charged with a crime for shooting.</u>

Hankison also asserts that the prosecutor violated the Court's instructions during trial to avoid litigating issues for which Hankison was not on trial; specifically, whether any other officer could or should have been charged with a crime for firing into the apartment complex.[8]  Hankison's motion describes, in part, the admonishment made by the Court, and then lists several statements made during closing arguments by the prosecutor which he alleges were contrary to the Court's

---

[8] The argument that the defense attempted to assert at trial was more relevant to Count 2, regarding the neighbors in the apartment behind Taylor's apartment.  Thus, the Court questions whether, even if there had been improper commentary on this issue in closing arguments, it would have had any affect to mislead the jury or prejudice Hankison as to his guilt on Count 1.

As the trajectory evidence demonstrates, two of Cosgrove or Mattingly's bullets, which were shot from the doorway of Taylor's apartment in response to Walker's initial shot, went through Taylor's kitchen ceiling and into the apartment above Taylor's. [DE 207, Trial Tr. Vol. 5-B at 13500-01]. The comparison sought to be made by defense at trial was that it was unfair or illogical that Hankison was on trial in Count 2 for the bullets that went through Taylor's kitchen and bathroom walls into the neighbor's apartment, while Cosgrove or Mattingly was not charged for those bullets that reached the neighbor's apartment above.  The Court noted that this violates the jury's instruction to only consider the Defendant on trial.

> Also keep in mind that whether anyone else should be prosecuted and convicted for these crimes is not a proper matter for you to consider. The possible guilt of others is no defense to a criminal charge. Your job is to decide if the government has proved the defendant guilty. Do not let the possible guilt of others influence your decision in any way.

[DE 228, Jury Instructions, at 10881].

instructions. [DE 254 at 13593-95].  However, Hankison fails to analyze how the statements

violated the Court's instructions, why they were improper, or cite to any caselaw.  Counsel merely

block quotes excerpts of the prosecutor's closing argument, emphasizing words or sentences in

bold or italics, but providing no argument as to how the statements were improper other than the

assertion that the excerpts were not in keeping with the Court's instruction, an instruction defense

counsel concedes in reply he may have simply misunderstood.  [DE 254 at 13594; DE 265 at

13801]. The United States responds in the body of its analysis.  [DE 260 at 13759-61].

     In preparation for closing arguments, the Court provided some words of caution to counsel.

Specifically,

> I just want to make clear that this case is not about litigating the prior search
> warrant. There are criminal matters out there already. There's two pending in this
> court. So we are not litigating whether or not those were good search warrants.

> We're not litigating whether or not SWAT should have been executing this search
> warrant or not. That's not for this court case.

> We're certainly not litigating whether there were other officers that may or may not
> have been doing something that they may or may not should have been doing. Only
> this officer is on trial. And to suggest that there are other officers that have done
> something wrong or should have been on trial here, that's not a proper argument.
> We're not litigating that. What we are litigating is this one defendant's decisions
> on that night based on the information he had on that night.

[DE 222, Trial Tr. Vol. 9-B at 12359-60].

     After questions from the prosecution, Defense counsel asked a follow up question about

the Court's instructions.

> I don't have any intention at all to talk about—in litigating the search warrant,
> whether it was a good search warrant or a bad warrant, whether SWAT should have
> done this or not. I have no intention at all about making any arguments or illusions
> to jury nullification.

I just do want to put this out there. I think the other officers who were present who have given their opinion about what Detective Hankison did and whether it was reasonable or whether they would have done it, I think, calls into question some line of comment about their actions that evening and what they did and didn't do.

I'm not suggesting that anyone committed a crime or violated a policy here, but I think it's incumbent upon me to talk to the jury about what these other officers perceived and what they did based on their perceptions.

But I promise you I'm not going to get anywhere near a jury nullification argument. I'm not even sure how I could make that. We're focused on Brett. But these officers are—have been held out, I'm assuming, and the Government will argue, 'Well, these are reasonable officers, and you should listen to them because they said they wouldn't do what Mr. Hankison did.'

[*Id.* at 12362-63]. In response, the Court reiterated that the opinions of the attorneys were not permitted but stated that:

You are certainly permitted to point out discrepancies in what officers did or did not do on the scene and how that correlates with what the jury's heard about their training, but you cannot insinuate that some other officer should have been—should have been . . . we had one snippet of it a couple of days ago where we came really close on talking about another officer that maybe should not have—should be on trial as well.

And I don't want that because that's -- that does not matter. This defendant is the only defendant on trial. I am pretty sure that's in all of our jury instructions that you can't consider whether somebody else should be on trial with him. It's just him.

So I think you can absolutely point out what other officers on scene did or did not do and how that matched up with their training. You know, they can decide for themselves who's reasonable or unreasonable. But you're presenting what they did and what they saw with that -- you know, with that understanding. This is a reasonable officer, what a reasonable officer would have done with the information available to them.

And so I think all of that, what other officers did and did not do and how it correlates to their training, is fine. But to imply that somebody else—that only he is only trial or that he is being railroaded into a trial because he's the only one on trial, those things are completely inappropriate.

[*Id.* at 12364-65]. Defense counsel stated, "I understand and agree." [*Id.* at 12365].

Hankison now asserts that several statements made in closing argument violated the Court's instructions. Each of the statements objected to discuss the fact that Hankison fired through the covered windows and doors, while the other officers on scene did not, and those who did fire their weapon did so through the open doorway. [DE 254 at 13594]. The United States points out that each statement focuses on the officers' perceptions about whether they could or would fire through windows and doors that were covered. Each statement is based on what the officer would do as a result of what he could see, it did not discuss litigating whether any other officers' behavior was criminal or whether another officer should be on trial for such behavior. These statements were neither improper nor issues that the Court specifically requested the parties not approach. Further, the prosecutor's statements were consistent with the testimony in the case and in keeping with the jury instructions regarding the reasonable officer standard. [DE 228, Jury Instructions, at 10888 ("[t]o determine whether any force used by the defendant was objectively

reasonable, you should consider all of the facts and circumstances as they would be viewed by an

ordinary and reasonable officer on the scene at the moment that force was used.")]. [9]

---

[9] Hankison identifies seven excerpts. The first excerpt [DE 241, Trial Tr. Vol. 11 at 12840, ln. 25-41, ln.6] is analyzed *infra*. The second [*Id.* at 12843, ln.11-13] and fifth [*id.* at 12845 (summarizing the section of closing argument that began with the second quote)] excerpts address the same basic quote "you know that no reasonable officer would have fired through those closed blinds and curtains of an apartment building because no other officer did." This quote specifically addresses the reasonable officer standard called for in the jury instructions and does not address the criminality of any other officers' actions.

The fourth excerpt [*Id.* at 12844] states "None of the other six officers fired into those windows because firing blindly into covered windows in a home was not an option based on their policy and their training and their common sense. Firing into covered windows in an apartment building is not a valid police tactic. It's a crime." The first and second sentences accurately reflect testimony and inferences that can be drawn from the testimony regarding LMPD's training and policy and does not address any area prohibited by the Court's instruction. While the third sentence goes to the ultimate issue, a prosecutor is "free to argue that the jury should arrive at a particular conclusion based upon the record evidence . . ." *Caldwell v. Russell,* 181 F.3d 731, 737 (6th Cir. 1999), *abrogated on other grounds as recognized by Mackey v. Dutton,* 217 F.3d 399, 406 (6th Cir. 2000).

The sixth excerpt [*Id.* at 12850, ln. 3-8] and surrounding context [*id.* at 12849, ln. 22-50, ln. 3], discusses the officers' perceptions,

> So the defendant only wants you to focus on that first requirement about whether he perceived a threat because he has no answer at all for the second requirement that he has to act reasonably in response to that threat. The defendant had no target identification when he shot. There's just no question that the defendant, like all the other officers on scene, perceived a threat. But all the officers on scene perceived that same deadly threat and none of the other officers fired through the covered windows because they didn't have target ID, they couldn't do it safely, and they told you that decision was not a close call because that's not reasonable.

Again, the statement accurately discusses testimony and valid inferences. It reflects the reasonable officer standard, and the statement does not address any area prohibited by the Court's instructions.

And finally, the seventh excerpt [DE 241, Trial Tr. Vol. 11 at 12916, ln. 10-14] discussed defense counsel's focus on whether the officers knocked and announced and that being a red herring because all the officers knew there was a threat regardless of whether "that was a threat because the person inside had been surprised and, like, shot in self-defense or because the person inside was a criminal and was trying to shoot the police." [*Id.* at 12916, ln. 4-7]. The excerpt stated "But none of the other officers responded to that threat by going around to the side of the apartment and shooting through covered windows they couldn't see into and putting innocent lives in danger. That's why the defendant is guilty." [DE 241 at 12916, ln. 10-14]. As with the previous statement, this was based on testimony and inferences properly drawn. Again, the prosecutor was able to indicate the outcome requested and it does not broach the areas referenced in the Court's instruction. *Caldwell,* 181 F.3d at 737. Finally, this excerpt was made in the prosecutor's rebuttal argument and in response to defense counsel's arguments. While this would not excuse any error, it does mitigate the severity of any harm. *See Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir. 1982).

Moreover, the prosecutor's now objectionable statements comprise the same topics that defense counsel vigorously requested he be able to comment on in his closing as well and which the Court permitted.  [DE 241 at 12874-78].  Defense counsel argued to the jury:

> Detective Hankison who fired here, that conduct shocks the conscience and is outrageous and violates every training principle that any police officer has ever heard. These shots hit the same wall. This bullet is deposited right next to the bullet that Detective Hankison fired. Yet this is reasonable, that's reasonable, and this is criminal.

[DE 241 at 12873-74].  The United States objected.  And defense counsel argued:

> Your Honor, Mr. Songer said in closing argument less than an hour ago, there were six officers who acted reasonably including the two officers who fired from there. He said in closing argument that Detective Cosgrove testified how what Brett did was unfathomably dangerous. And his whole argument is all those other officers were reasonable except Detective Hankison. And when we talked about this yesterday or the day before, Your Honor, I said I'm not going to suggest that other people should be charged, but what I'm going to do is compare the other officers' actions with Detective Hankison's to show that Detective Hankison was being reasonable.

[DE 241, Trial Tr. Vol. 11 at 12875].  Both the Court and the United States agreed that comparison between the circumstances in which other officers fired was fine, but whether another officer's shot should be considered criminal, was not appropriate.  The United States stated "I agree, Your Honor. No problem with them talking about the conduct of the different officers, just the criminality."  [DE 241, Trial Tr. Vol. 11 at 12877].  Then Court also stated:

> you can talk all you want about comparing the firing, what they saw, what they were looking at, all of that is absolutely fair game as to whether or not what they saw and what they did was reasonable, but the implication here is going a little far and I've already said that. So the implication here is probably not appropriate, so just step back from that. You can keep going on the same route, but about what they saw and what they did, okay?

[*Id.* at 12878].

Finally, the issue came up again in relation to rebuttal. Counsel for Defendant objected[10] to the United States' rebuttal argument addressing the comparison of Hankison's shots to those of Cosgrove and Mattingly.

> defense attorney also showed you those trajectories and talked about all the shots fired by officers on scene and said something pretty extraordinary. Said that the defendant did the same thing as Mattingly and Cosgrove in the doorway. The same thing. So let's talk about a few of the differences that you all heard during this trial.

[*Id.* at 12904]. Defense counsel stated his objection and the Court responded.

> MR. MALARCIK: Your Honor, this is exactly what I was not permitted to do. This is just not fair. I couldn't get into the differences between those officer[s][sic] and what they did and didn't do and the effect of their actions and now he's going to be able to say to this jury for the last 15 minutes exactly what I was prevented from doing.
> THE COURT: You—I told you that you could talk about their perspective, what they saw, I told you, you could talk about what they experienced. What I don't want to get into, right, was where their bullets were going.
> MR. MALARCIK: Then I would expect the government cannot talk about where those bullets went either in this rebuttal. That's the fair thing to say.
> MR. SONGER: I'm not planning to. I'm talking about the circumstances they're shooting.
> THE COURT: It's what I said to you, you can talk about what they saw and their perspective. You're perfectly entitled to talk about that. I don't have a problem with that. The only thing is the comparison of those issues when we get to the criminality which is, well, these bullets went into a neighboring apartment and those bullets did not. And I thought I was pretty clear, you could go on as much as you wanted about their perspective and what they saw and making that comparison. It's just the criminality piece which really only goes to that last little bit of what happened to their bullets, not what they were doing or seeing or experiencing. So, I think that's – that's fair on your side, fair on their side. The only thing that's not is just that criminality piece. Is that –
> MR. MALARCIK: I respectfully disagree and I object.
> THE COURT: To?
> MR. MALARCIK: If the government starts talking about the direction of Detective Hankison's bullets and how that is unconscionable and how it's unreasonable and how it's a crime, then I should be able to get back up and talk about the direction of the other officers' bullets. That's only fair.
> MR. SONGER: He did talk about the direction of the other officers' bullets.

---

[10] This was the only time defense counsel objected on an issue related to this motion for new trial.

> THE COURT: And I didn't strike any of that. Let's be clear, I didn't strike any of
> that. I struck nothing that you had previously said, but we were getting to the point
> of getting into the criminality and that was the objection. I didn't strike anything
> about that.
> MR. MALARCIK: Mr. Songer cannot make a conclusion about the criminality of
> any shots fired anywhere.
> THE COURT: No, he can't make –
> MR. SONGER: I don't plan to.

[DE 241, Trial Tr. Vol. 11 at 12904-05].  The United States was directly addressing the factual

comparison drawn in defense counsel's argument that "[t]hese shots hit the same wall. This bullet

is deposited right next to the bullet that Detective Hankison fired. Yet this is reasonable, that's

reasonable, and this is criminal," and continued to make the same comparisons.  Defense counsel

was permitted to draw the comparison but was not permitted to argue that or imply that the other

officers' shots were criminal or that they should have been charged with a crime.

In reply, although not identified by a particular heading, defense counsel concedes that

"[t]he undersigned won't rule out the possibility of misunderstanding the Court's instruction, and

it being intended to be narrowly construed to statements regarding criminality."  [DE 265 at

13801].  As the numerous quotes from both the Court and prosecutor indicate, that was the

instruction, that comparisons were appropriate, but whether another officer's bullet was criminal

(and whether another officer should be on trial) was not.  The reply brief then redirects its

arguments to how these comparisons "misstate[] the evidence" which is addressed *infra*.  [*Id.*].

The prosecution necessarily has "wide latitude" during closing argument to respond to the

defense's strategies, evidence, and arguments. *Henry,* 545 F.3d at 377.  Moreover, under *United

States v. Collins,* 78 F.3d 1021, 1040 (6th Cir.1996) and *United States v. Parker*, 49 F. App'x 558,

563 (6th Cir. 2002), counsel must be given leeway to argue reasonable inferences from the

evidence. The comparisons here were not improper and they did not exceed the scope of defense

counsels' own arguments. Finally, because defense counsel made similar comparisons during

closings and discussed the need to be allowed to make these comparisons during various objections, it is now insincere to argue that these comparisons were inappropriate.

### 3.    Whether the prosecutor engaged in improper witness vouching

The Court affords significant discretion to a prosecutor during closing argument, "analyzing the disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were otherwise fair." *United States v. Boyd*, 640 F.3d 657, 669–71 (6th Cir. 2011) (quoting *Henry,* 545 F.3d at 377 (internal quotation marks and citation omitted)). That said, prosecuting attorneys have as much a duty "to refrain from improper methods calculated to produce a wrongful conviction" as they do "to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [government] behind that witness." *Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012) (quoting *Johnson v. Bell,* 525 F.3d 466, 482 (6th Cir. 2008) and *United States v. Francis,* 170 F.3d 546, 550 (6th Cir.1999)); *Trujillo*, 376 F.3d at 607–08; *United States v. Martinez,* 253 F.3d 251, 253–54 (6th Cir. 2001). "Generally, improper vouching involves either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Francis,* 170 F.3d at 550 (internal citations omitted). "It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." *Hodge v. Hurley,* 426 F.3d 368, 378 (6th Cir. 2005) (citing *Young,* 470 U.S. at 17–19). "An improper statement of personal belief, however, is not per se reversible error. [We] must find that the

improper statement was flagrant enough to 'warrant reversal.'" *Henry,* 545 F.3d at 380 (internal citation omitted). The prosecutor is, however, "free to argue that the jury should arrive at a particular conclusion based upon the record evidence . . ." *Caldwell,* 181 F.3d at 737.

> Defendant asserts that the United States
>
> made a variety of statements which amounted to expressing his personal opinion about the truthfulness and/or reliability of witnesses' testimony. Specifically, by imploring the jury to apply more weight to the testimony of officers called by the government throughout the entirety of his closing.

[DE 253 at 13596].  Without any further analysis, Hankison block quotes two sections of the prosecution's closing argument.  The United States responded arguing that "[t]he government's statements cited by the defense motion accurately recount witness testimony, describe witnesses' incentives to testify on behalf of the parties, and highlight other facts that are relevant to the jury's assessment of credibility—they do not express the prosecutor's personal opinions."  [DE 260 at 13761].

> The first block quote highlights public trust in law enforcement.
>
> He [Defendant] gravely underestimated the courage and character of those fellow officers. No policeman ever wants to testify against one of their fellow officers, but officer after officer came into court during this trial and told you that firing into covered windows in an apartment building when an officer can't see inside violated not just the most basic rules that they're taught in their training but also what they stand for.
>
> Chief Humphrey told you when that happens, it breaks down the trust that police have to have in the community and end up making the job of police officers more difficult and more dangerous. All those officers came forward because they knew the defendant violated the oath that they all swore to protect human life.
>
> They knew the defendant did a disservice to all the law enforcement officers who put on their uniform every day to protect and serve. He dishonored every one of them when he fired blindly into the homes of innocent people.

[DE 241, Trial Tr. Vol. 11 at 12838].  This quote does not directly implicate any personal opinion of the prosecutor or attempt to support the witness's credibility.  It does seek for the jury to draw

a connection between an officer's reticence to testify against a fellow officer and the fact that they testified against a fellow officer here. The inference being that because they testified against an officer, it must have been truly dishonorable behavior.

It is permissible for a prosecutor to assert that a witness is telling the truth or failing to tell the truth during closing argument by "emphasizing discrepancies between the evidence and that defendant's testimony" or identifying where the evidence aligned. *Francis,* 170 F.3d at 551. "To avoid impropriety . . . such comments must reflect reasonable inferences from the evidence adduced at trial." *Id.* (internal quotation marks omitted); *Wogenstahl v. Mitchell*, 668 F.3d 307, 331 (6th Cir. 2012). Counsel for the United States used inferences to make such a connection here and did so by referring to the testimony of Chief Humphry and other officers. As is permissible, the United States properly "encourage[ed] the jurors to look at the evidence presented while considering the motivations behind the testimony." *Id.* (rejecting defense argument that prosecutor vouched); *see also Collins*, 78 F.3d at 1040 (finding that a prosecutor did not vouch by telling the jury that various government witnesses had "no reason to lie" and emphasizing that "counsel must be given leeway to argue reasonable inferences from the evidence").

The second block quote focuses on whether the officers had any incentive to be untruthful.

But one thing you can keep in mind when you're evaluating their testimony, as the judge instructed you is their connection to different parties in the case. And here you should keep in mind that none of the police officers who testified have any connection to the government, none of them work for the federal government, none of them got any deals or special treatment, and almost all of them worked at the defendant's agency. Many of them were his friends.

You know that police officers don't get any medal if they come into court and testify against one of their fellow officers. That's a hard thing for them to do, so you know when those officers took the stand, they had every incentive to try to shade their testimony in the defendant's favor. And the fact that so many of them didn't, that they told you in clear terms that what the defendant did was wrong, that officers cannot shoot through covered windows into homes where people live, that tells you how outrageous the defendant's conduct was.

[DE 241, Trial Tr. Vol. 11 at 12911].  This quote also does not directly implicate any personal opinion of the prosecutor or improperly attempt to support the witness's credibility.  It does seek to draw an inference that because these officers were Hankison's friends and fellow officers [DE 218, Trial Tr. Vol., 8-B at 12170, ln. 23-72, ln. 12], they had no reason to lie and, may have had every incentive to shade their testimony in Hankison's favor, and yet, they did not.  The inference being that because they testified unfavorably to Hankison, they were not lying.  Again, the argument by the United States here is tied both to the evidence (they were friends with Hankison and Chief Humphrey's testimony regarding the unity of law enforcement officers who wear the uniform everyday [DE 248, Trial Tr. Vol. 7-A at 13370-71; 13372-73]), as well as to the jury instructions, here specifically how to evaluate the credibility of a witness, [DE 228 at 10899-10900].  As a result, these statements were not improper vouching because "the prosecutor was careful to tie his comments [and inferences] to the evidence that had been introduced," *Wogenstahl*, 2007 WL 2688423, at *71, and directly referenced the jury instructions.

### 4.   Whether the prosecutor made improper attacks on Hankison's credibility based on facts not in the record.

"It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." *Acosta*, 924 F.3d at 302 (citing *Hodge*, 426 F.3d at 378). To argue to the jury about a witness's credibility, a prosecutor should "highlight inconsistencies with a 'detailed analysis of the evidence.'" *Id.* at 303 (citing *Hodge*, 426 F.3d at 378). Examples of improper statements include saying a defendant "is lying to extricate himself from what he's done" or a witness "[s]hould [not] be entitled to any credibility whatsoever," when those statements are unaccompanied by analysis of the evidence. *Id.* at 302-03

(quoting *Hodges*, 426 F.3d at 379) (alteration in original); *see also United States v. Christie*, 2024 WL 1998512, at *3 (E.D. Tenn. May 6, 2024).

"[I]t is improper for attorneys, especially prosecutors who generally have the confidence of juries, to misstate evidence[.]" *United States v. Hall*, 979 F.3d 1107, 1123 (6th Cir. 2020) (quoting *Carter*, 236 F.3d at 785); *see also Washington,* 228 F.3d at 700 (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 646 (1974) and noting that a prosecutor's misrepresentation of material evidence can have a significant impact on jury deliberations "because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty."); *United States v. Solivan,* 937 F.2d 1146, 1150 (6th Cir. 1991) (Because jurors are likely to "place great confidence in the faithful execution of the obligations of a prosecuting attorney, improper insinuations or suggestions [by the prosecutor] are apt to carry [great] weight against a defendant" and therefore are more likely to mislead a jury.) *Cf.* A.B.A., ABA Standards for Criminal Justice Prosecution Function and Defense Function 3–5.8(a) (3d ed. 1993) ("The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.").

Hankison appears to assert (in a heading) that the United States made attacks on his credibility that were "not based on evidence or facts before then jury," then lists ten block quotes from the government's closing. [DE 254 at 13597-99]. Several of these quotes failed to identify how the excerpted statements purportedly lacked evidentiary support or would constitute some type of flagrant error.  Further, the seeming analysis portion after the list of block quotes is rambling and touches on numerous factual disputes about the testimony, the questioning of witnesses using FBI 302s and testimony from the prior trial, and arguments regarding what the defense believes were incorrect or misleading statements. Listing block quotes without any related

analysis is simply insufficient to preserve an objection. *Seifert*, 301 F. App'x at 196-97. That said, the Court analyzes each of the individual statements.

As to the first quote:

The defendant's own good friend -- good friend for 18 years, Detective Nobles, told you that he would not have fired those shots and he told you that the defendant firing through those windows made all police, quote, look like horrible cops and criminals.

[DE 241, Trial Tr. Vol. 11 at 12844]. The defense asserts that this excerpt is

deeply troubling for several reasons. First, speaking to the criminality of a defendant's conduct is exclusively within the dominion of the jury and inherently prejudicial. Second, the statements don't accurately depict the witness's testimony from the most recent trial, nor the preceding federal trial in 2023.

[DE 254 at 13600]. As an initial matter, this statement does not attack Hankison's credibility so its unclear what the defense is arguing other than that the statement is somehow misleading. But as noted by the United States this excerpt is "[f]ar from being misleading." [DE 260 at 13765 (quoting DE 218 at 12179, ln. 5-16) ("Q. You know you're not supposed to shoot through a window that's covered with closed blinds? A. Yes . . . Q. You wouldn't have done it? A. I don't think I would have done it. Q. You wouldn't have fired blindly into a residence because, quote, 'This is not Iraq.' A. Yeah."); *Id.* at 12185, ln. 2-5 ("Q. Not only that, your honest reaction was that the defendant shooting through covered windows made the whole team look like horrible cops and criminals; right? A. Not just -- not just those actions, but it didn't look good.")); *see also* DE 218 at 12170-12172].

Nobles was questioned regarding his federal grand jury testimony which was taken under oath. [DE 218 at 12182-83]. He responded to questions confirming his testimony, in agreement, although couching the response to the statement about "horrible cops and criminals" by saying he didn't recall it verbatim but if that was the answer "then that's what I answered." [*Id.* at 12183-

12185].  However, he felt that statement was in reaction to "[a]ll the surrounding" circumstances, not just Hankison's actions that "made us look like horrible cops and criminals." [DE 218 at 12185 ln. 5 ("Not just -- not just those actions, but it didn't look good."); ln. 9-14 ("All surrounding made us look like horrible cops and criminals. Now, if that direct question was asked and that's how I answered, then that's what I answered. But if that was two years ago, that was two years ago. I don't remember our conversation verbatim. I've had a lot go on since then. So, yes, we looked bad.")].  Nobles' statement "not just those actions" referring to Hankison's actions, but "all surrounding" appears to encompass both Hankison's actions and likely a reference to the warrant issues which were the subject of other lawsuits.  As a result, this was not a specific misstatement. Moreover, had Hankison felt the need to address any concerns about this statement they had the opportunity on cross examination and in defense closing, but did not. On this record, the Court cannot find the prosecutor's statement to be improper or seriously misleading and did not attach "Hankison's credibility on facts not in evidence."

Additionally, the reference here to "criminals" is made in the context of law enforcement in general and not to the specific criminality of Hankison.  Further, Hankison's assertion that the "criminality of a defendant's conduct is exclusively within the dominion of the jury and inherently prejudicial," is incorrect as a prosecutor may argue in closing that the evidence proves the defendant guilty of the crime charged. *See, e.g., United States v. Sherrill*, 388 F.3d 535, 538 (6th Cir. 2004) (proper for prosecutor to tell the jury in closing "that man is guilty").  The prosecutor is "free to argue that the jury should arrive at a particular conclusion based upon the record evidence . . ." *Caldwell,* 181 F.3d at 737, *abrogated on other grounds as recognized by Mackey,* 217 F.3d at 406; *see also Sherrill*, 388 F.3d at 538; *Caldwell*, 181 F.3d at 737; *United States v. Reliford*, 58 F.3d 247, 250 (6th Cir. 1995) ("A prosecutor in closing argument may review the

evidence that has been presented, and may comment on the strength of the Government's proof . . ." as long as it does not improperly vouch for witnesses or suggest guilt based one extraneous factors). The prosecution's statement was made in the context of an extensive trial record. The prosecutor's statement in this first quote is based on evidence in the record, does not mislead, and is not improper.

As to the second quote

> So the defendant claimed that as he ran around to the side of the apartment, he thought that he heard the person inside the apartment marching up through that hallway through the living room shooting at his officers in the doorway, but even if the defendant somehow really thought he did hear that, it's no defense.

[DE 241 at 12852]. In regard to this quote, Hankison appears to object to the use of the word "marching," stating that "Defendant has never once testified to discharging his firearm because he heard someone marching inside of the apartment as claimed by the prosecutor." [DE 254 at 13599]. Hankison argues that in this excerpt "[t]he prosecutor distorted [Defendant's] testimony in closing by stating the defendant claimed to have heard someone marching down the hall." [*Id.*]. Instead, the motion asserts that the defendant "has consistently maintained that as he rounded the corner of the vestibule/entryway of the apartment he thought the shooter was advancing based increased sound and loud percussion of the gunfire, as well as the corresponding bright illuminations of the sliding glass door from the muzzle flashes." [DE 222 at 12334]. "Further, he testified that due to the visual and auditory stimuli, he believed the shooter was advancing on his fellow officers and executing them with an AR-15 in the fatal funnel." [*Id.* at 12340].

But the prosecutor's statement is not misleading or a mischaracterization of the testimony. Whether Hankison used the word "marching" specifically or not in relation to his belief that the shooter was advancing down the hall, he did confirm that summary of his testimony on cross examination. [DE 240 at 11488-89 (Q: "You said that you knew that your officers were still

trapped in the breezeway, you said you knew that the suspect inside was marching up the apartment toward the front door. Do you remember saying those things? A. Yes, sir.")].  The prosecutor is not required to recite testimony verbatim in closing arguments. *Henry*, 545 F.3d at 377 ("[w]e afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole . . ."); *United States v. Drake*, 885 F.2d 323, 324 (6th Cir.1989) (the prosecutor is permitted to "summarize the evidence and comment upon both its quantitative and qualitative significance."). Moreover, the jury instructions emphasized that the lawyers' statements and arguments are not evidence and did note that "it is also possible for a mistaken belief to be reasonable under the facts and circumstances." [DE 228 at 10895; 10888].

While Hankison did not make arguments with respect to the third excerpt, the Court finds no misleading statements or evidence outside the trial testimony.  The prosecutor used evidence in the record to call into question Hankison's recitation of the events. "[H]ighlight[ing] inconsistencies with a 'detailed analysis of the evidence," is appropriate. *Acosta*, 924 F.3d at 302.

Excerpts four through seven all focus on whether Hankison knew his actions were wrong and therefore, his actions were willful.  [DE 254 at 12598; 13599-600].  Hankison argues that the testimony regarding training was not as strong as asserted by the United States and that because "the department has never provided a training scenario similar to what Defendant was faced with," there is not sufficient evidence to infer that the "Defendant knew what he did was wrong."  [*Id.*]. Because the United States is required to prove willfulness, these issues were proper for discussion by the prosecution in closing arguments.  [DE 228, Jury Instructions at 10883, 10885, 10891 ("you may also consider whether the defendant had been trained, and whether his actions were consistent or inconsistent with that training.")].  Hankison's arguments here are simply without merit.  Just because the defense sees the strength of the evidence differently, that does not mean the

prosecutor's statements were improper or misleading.  Hankison fails to point to anything that was specifically misstated.  Arguments about the strength and significance the evidence are fodder for closing arguments.  *Drake*, 885 F.2d at 324.

As to the last two excerpts, relating to whether Hankison knew he would "get away with it" because he "never thought his fellow officers would" testify against him.  These two quotes were not discussed by Hankison except in two footnotes appended to the block quotes. [DE 254 at 13598, n. 6 & 7].  Hankison states in the first footnote that the United States "quite literally manufactured the notions that the Defendant 'thought he'd get away with it' and never thought his fellow officers would testify against him."  [*Id.* at 13598, n.6].  The United States asserts that this inference is made from the fact that he willfully "broke the law in front of his fellow officers" and is a commonsense inference.  [DE 260 at 13764].  Because the United States was required to prove willfulness and because the inference is based on the testimony regarding what training officers received regarding target identification, the inference is relevant and carefully connected to testimony.

Footnote seven is attached to a bold italicized phrase, "they told you that police officers cannot take the law into their own hands by firing through covered windows into people's homes no matter what happened before that.  [DE 254 at 13598 (emphasis removed)].  It states that "the prosecutor yet again misled jurors into believing that LMPD training policies carried relevance beyond being [sic] weighting [sic] to the element of willfulness."  [DE 254 at 13598, n.7].  While the argument is somewhat unclear, the excerpt specifically references the testimony regarding LMPD training and policy provided by several officers and Chief Humphrey.  These are facts well established in evidence about what LMPD policy requires as to visual identification and the fact determination of whether an officer can shoot can change from moment to moment and must be

determined at the time the shots are fired. The reference to "no matter what happened before that," is reference to the testimony regarding the shot fired by Walker when the door was breached. While it does not specifically address that LMPD policy can only be used to determine willfulness, that instruction was clearly given in the jury instructions and the Court must assume those instructions were followed. [DE 228, Jury Instructions at 10904; *Starnes*, 552 F. App'x at 524]. The Court finds no improper attacks on credibility, misleading, or inferences not based on testimony of record.

The prosecutor is "free to argue that the jury should arrive at a particular conclusion based upon the record evidence . . ." *Caldwell,* 181 F.3d at 737. The prosecution's statements were made in the context of an extensive trial record and, given the wide latitude afforded to closing arguments, none of the statements asserted were improper.

5.  Whether the prosecutor made improper appeals to the jury to act as the community conscience.

Hankison makes two primary arguments to support his argument that the prosecutor improperly and "unfairly appealed to the local and national interests of the jury" during closing arguments. [DE 254 at 13602]. First, he argues that the specific statements in closing were tailored to appeal to the emotions of the jury. [*Id.* at 13601-04]. Second, Hankison argues that these statements were improper based on the context of the "community interest and the wider social-political context in which the guilty verdict was rendered." [*Id.* at 13604].

In *Solivan,* 937 F.2d at 1150, cited extensively by Hankison, the court recognized that because jurors will typically place "great confidence in the faithful execution of the obligations of the prosecuting attorney, the prosecutor must observe a high standard of conduct to ensure that the defendant's right to a fair trial is not prejudiced." *United States v. Lawrence*, 735 F.3d 385, 432–33 (6th Cir. 2013) (summarizing *Solivan*). Because of this confidence, the Sixth Circuit has

emphasized that a prosecutor must avoid "undignified and intemperate" arguments and arguments that may contain "improper insinuations and assertions calculated to mislead the jury" by inciting passion and prejudice. *Id.* (citing *Solivan,* 937 F.2d at 1150). However, "[u]nless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *Solivan,* 937 F.2d at 1151. Nor is it improper for the prosecutor to refer to the community's overarching need to convict individuals who are guilty of criminal activities. *Id.* at 1154.

In *Solivan,* the prosecutor overstepped by petitioning to the jurors' anxiety and fear regarding the nation's "War on Drugs" with the specific goal of "arous[ing] passion and prejudice" and to entreat them "to send a message and strike a blow to the drug problem." *Id.* at 1153. The *Solivan* court observed:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future law breaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*Id.* (quoting *United States v. Monaghan,* 741 F.2d 1434, 1441 (D.C. Cir. 1984)). The Court in *Hicks v. Collins,* 384 F.3d 204 (6th Cir. 2004), distinguished *Solivan,* finding a prosecutor's statements "it is time you sent a message to the community" and "the people in the community have the right to expect that you will do your duty," permissible. *Id.* at 219. The *Hicks* Court found these references closer to "the general community need to convict guilty people." *Id.*

With respect to "send a message" arguments, the Sixth Circuit addressed these types of arguments in *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998). There, the plaintiff referred to the jury as "the voice of the community" and asked them to "tell" the defendants and

"the world where you stand" and "your voice will be heard." *Id.* The *Strickland* court concluded that such arguments "can have no appeal other than to prejudice" and amount to an "'improper distraction from the jury's sworn duty to reach a fair, honest and just verdict." *Id.*

Hankison asserts improper statements in a large block quote, consisting of three sections of the United States' closing argument[11] and one section of the United States rebuttal argument. Much of the quote relates to Chief Humphrey's testimony regarding a breakdown of trust that the community has in law enforcement, dishonoring of law enforcement officers in general, and Hankison's belief that other officers would not testify against him. Several of these issues have been previously discussed in other sections.   These excerpts are specifically related to the credibility of the testimony from other officers. *See e.g. supra* at p. 30-31.   While the prosecutor states that Hankison's actions were a dishonor to other officers and a disservice to law enforcement generally, each statement can be found to have a basis in testimony, either the testimony of Chief Humphrey cited *supra* or other officers who testified about their shock regarding Hankison's actions [DE 212 at 11914, ln. 16-25; DE 207 at 13527, ln. 5-16]. The prosecutor specifically references the testimony in the closing argument.   So, first and foremost, the statements, and inferences that come from these statements, are based on an extensive record. Second, these portions of the closing argument specifically go to credibility of witnesses and do not appear to be an appeal to the jury to act as the community conscience.   Finally, because they summarize testimony, it cannot be argued that these statements were "deliberately injected . . . to inflame." *Solivan*, 937 F.2d at 1153-54.   They were already largely in the record. This testimony was already heard by the jury.   Highlighting this testimony in closings does not somehow then make it calculated merely to incite passions and prejudices of the jurors.

---

[11] Defense counsel only provides citation for two of the three block quotes from prosecutors closing argument, sections one and three.   The second section is found at DE 241 at 12860 lines 10-25.

Finally, only one of the statements directly makes an appeal for Hankison's guilt. The third quote represents the final three sentences of the prosecutor's closing argument.

> The evidence proves that the defendant committed that crime. You can recognize the courage of those fellow officers who came forward and hold the defendant accountable for the crime that he committed. Find him guilty.

[DE 241 at 12861]. As an initial matter, it is permissible for a prosecutor to argue in closing that the evidence proves the defendant guilty of the crime charged, as is the case in this quote. *Sherrill*, 388 F.3d at 538; *Caldwell,* 181 F.3d at 737. The question here is whether through this statement the prosecutor is "urge[ing] jurors to convict a [Hankison] in order to protect community values, preserve civil order, or deter future law breaking." *Solivan*, 937 F.2d at 1153. While the statement does ask the jurors to hold Hankison accountable, it is based first on "recogniz[ing] the courage of those fellow officers who came forward," not on some vague idea of the jury being the community conscious and solving a social problem. While a somewhat similar plea to the jurors, the Court does not find it rises to the level of requesting the jury "to send a message and strike a blow to the [] problem." *Id.* at 1153. And because the plea to the jury remains rooted in the evidence, the prosecutor has not overstepped.

More concerning to the Court, are Hankison's alleged attempts to place this case in "context." Hankison asserts that the jury reached its verdict "four days before the presidential election." [DE 254 at 13604]. He asserts that the election cycle emphasized police excessive force cases as a major policy agenda and that Ms. Taylor was mentioned in the Democratic National Convention by one of its speakers. [*Id.*]. However, Hankison fails to indicate, other than the mere timing of the trial and the election, how any of the comments in the United States' closing argument sought to interject political issues into the jury's deliberations. The Court finds no connection between the prosecutor's statements in closing arguments and the then political environment. It is

41

not enough that the political and social environment existed close to an election, but the prosecution must say or do something to bring it into the trial. The quotes identified by Hankison do not bring the social or political environment into the trial, or make it an issue for the jury to consider.

Finally, as the United States noted "[t]he defendant's argument is particularly outrageous because the only reference during trial to the election was . . . from the *defense attorney* during closing argument." [DE 260 at 13768; DE 241 at 12862-63 (". . . next week we're going to have something pretty important if you remember, the election, where we have this transition of power and it is part of our democracy and it is incredible.")]. This argument is simply without merit.

Moreover, Hankison's argument with respect to the jurors' "fears" regarding "riots" and emotions was extensively discussed and dismissed in the Court's memorandum opinion and order denying Hankison's motion for leave to conduct post-trial interviews of jurors. [DE 271, Feb. 7, 2025, Memorandum Opinion and Order]. The Court adopts and incorporates those findings here by reference. As a result, Hankison's community conscious argument must be rejected.

6.   Whether the prosecutor engaged in improper witness bolstering.

While "'[i]mproper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness," *Martinez,* 253 F.3d at 253–54 (quoting *Francis,* 170 F.3d at 550), "'[b]olstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury.'" *Id.* at 254 (quoting *Francis,* 170 F.3d at 551); *see Trujillo*, 376 F.3d at 607–08. The Court in *Francis* stated that the prosecutor "may ask a government agent or other witnesses whether he was able to corroborate what he learned in the course of a criminal investigation. However, if the prosecutor pursues this

line of questioning, he must also draw out testimony explaining *how* the information was corroborated and where it originated." *Francis,* 170 F.3d at 551 (emphasis added). "Thus, if a prosecutor asks a government agent whether the agent was able to corroborate information provided by an informant, the prosecutor must introduce to the jury how that information was corroborated, e.g., via documents or searches." *Martinez*, 253 F.3d at 254 (citing *Francis,* 170 F.3d at 551).

However, where the information is introduced into evidence through other witnesses or exhibits or the information is already known to the jury, there can be no bolstering as all the information is in the evidentiary record. In *United States v. Covington*, the Sixth Circuit rejected the claim of improper bolstering because the physical evidence referred to by the prosecutor was introduced into evidence through other witnesses, ensuring that the jury was aware of the corroborative evidence. 7 F. App'x 386, 390 (6th Cir. 2001) ("Bolstering occurs when the government implies that the witness's testimony is corroborated by evidence known to the government but not the jury. Covington's argument fails, however, because although Agent Walls did not testify, the physical evidence referred to was introduced into evidence through witnesses other than Agent Walls."). This principle underscores that bolstering requires reliance on evidence outside the trial record.

Hankison identifies the testimonies of three witnesses, Myles Cosgrove, Jason Vance, and Matt Russel, which he asserts were bolstered by facts outside the record. In the case of Cosgrove, the first quote identifies four pieces of evidence Cosgrove learned after the incident, but again Hankison provides no analysis of how these excerpts of testimony are bolstering. [DE 254, at 13605-06 (citing DE 207 at 13450, ln. 21-13451, ln. 10)]. First, Cosgrove learned the identity of the officer firing from the parking lot through the glass door and window, Hankison. Defense

43

asserts that he was not asked *how* he came to learn the identity of the individual, and thus, the excerpt represents improper bolstering.  The identity of the officer who was shooting, however, was never at issue in the case.  The jury heard multiple times throughout the trial that Hankison admitted to shooting and he testified to the same.  [e.g., DE 222, at 12334-45, DE 240 at 11489].  It was an undisputed fact and did not lend any credibility to Cosgrove's testimony regarding how shocked he was that someone was shooting from that location.

Second, Cosgrove learned that Hankison's shots placed him personally in danger but was not asked how he learned that fact.  During trial, however, expert witnesses testified and provided exhibits diagramming the trajectories of Hankison's bullets. [DE 211, Trial Tr. Vol. 6-A at 12965, 12980-98].  The jury was made aware of how those trajectories were calculated by other expert witnesses. [*Id.* at 12965, 12980-98]. And, again, this knowledge did not lend any credibility to Cosgrove's testimony regarding his reactions to the shooting.

Third, he was asked if he later learned that the first shot fired came from Kenneth Walker's gun but was not asked how he learned that information.  Again, experts testified about which bullets came from which firearms. [DE 211, Trial Tr. Vol. 6-A at 12965, 12980-98].  This fact of the specific identity of Walker was not in dispute and it did not lend any credibility to the testimony at issue as to whether Cosgrove perceived a threat.

Finally, Cosgrove learned how many rounds he discharged, but was not asked how he learned that fact.  Again, this was information testified to by experts and available to the jury. [DE 211, Trial Tr. Vol. 6-A].  Moreover, the fact did not lend any credibility to Cosgrove's testimony regarding his reactions to the shooting.  None of these excerpts involve bolstering because they all rely on facts that were in the record and available to the jury and they do not corroborate the

44

relevant witness's testimony. In fact, most questions merely fill in well-established details which the jury heard about during the trial.

Similarly, Jason Vance was asked about information he learned later, after the night of the incident. And again, the excerpts include no analysis of how they constitute bolstering. Vance was a Public Integrity Unit ("PIU") investigator who was on-scene the night of the incident investigating this officer-involved shooting and he was later named the lead investigator on this case. [DE 211, Trial Tr. Vol. 6-A at 12941-42]. He testified extensively about how PIU and Crime Scene Unit ("CSU") identify and handle evidence, do interviews, and investigate officer-involved shootings. [*Id.* at 12935-42]. He was asked about his knowledge of the bullet found in the entryway of Taylor's apartment, [DE 254 at 13608 (citing DE 211 at 12987, ln. 6-24)],[12] if he learned that the bullet in the entryway came from Walker's gun, the one located on the photographs as marker 37, [*id.*]; about whether the shell casings in the parking lot were later matched to a particular weapon, that of Hankison, [DE 211 at 12991, ln. 14-12992, ln. 5]; and how many bullets Hankison fired through the window and door, [DE 211 at 13009, ln. 16-25]. Defense argues that he was never asked how he learned these facts and thus, the questions were improper bolstering. As with similar questions posed to Cosgrove, none were contested, all were available to the jury in the record, and several were provided to the jury in exhibits. Moreover, as Vance worked on the investigation and described at length his role several of the issues dealt directly with parts of the investigation he worked on and described in his investigatory process.

Hankison additionally identifies an excerpt from Vance's testimony containing two pieces on information regarding Walker. [DE 254 at 13606 (citing DE 211 at 12970, ln 1-71, ln. 3)]. The first piece of information was whether Walker had an active permit for a concealed weapon.

---

[12] These line numbers were cited incorrectly in the original motion.

Defense argues that he was never asked how he knew that Walker did have a permit. However, Vance appears to confirm how he learned this piece of information when asked if he reviewed documents regarding the permit. [DE 211, Trial Tr. Vol. 6-A at 12970, ln. 7-9]. This is in keeping with the Sixth Circuit's instructions in *Francis*, 170 F.2d at 551. As such, both the information and how it was obtained are in the excerpt. It is not bolstering.

In its argument, however, Hankison appears to assert, not that the excerpt was bolstering but misleading, and that the prosecutor should have corrected the impression that Walker was a "lawful possessor of a firearm." [DE 254 at 13607].[13] Defendant asserts that

> Kenneth Walker openly admitted to investigators during his interview at the Public Integrity Unit to smoking marijuana twice that week, including earlier that evening, five times that month, approximately twenty times the month before that, and smoking once a day for prolonged periods of time. In light of his open admissions which were known to the prosecution, per federal regulations, the notion that Kenneth Walker was a lawful possessor of a firearm is patently false.

---

[13] In the reply brief, Hankison asserts a new legal argument surrounding whether the United States "knowingly and intentionally elicited False, Misleading and/or perjured testimony on multiple occasions." [DE 265 at 13806-09 (capitalization altered)]. Hankison asserts this argument was previously asserted in its motion but improperly "captioned under the heading improper bolstering," yet "it was very clearly conveyed that each of the statements. . .were at best 'profoundly misleading.'" [DE 265 at 13807]. Arguably, this section broadens Hankison's arguments related to Vance's testimony. As a result, Courts in the Sixth Circuit have found issues to be waived when they are raised for the first time in in replies to responses. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (citing *Am. Fam. Prepaid Legal Corp. v. Columbus Bar Assoc.*, 498 F.3d 328, 335 (6th Cir. 2007)).

> Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration. Further the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived.

*Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (finding that plaintiff had failed to preserve an issue for review by not presenting it in its principal summary judgment brief and raising it for the first time in its reply brief). So, to the extent, the United States did not get an opportunity to respond to the new arguments, those arguments are waived.

[DE 254 at 13607 (citations omitted)].  The Courts finds these arguments unavailing.  The questions were "can citizens in Kentucky own handguns for protection" and did Walker have a permit.  The question was not whether it was legal for Walker to possess the handgun.  The questions were not improper and certain do not contain "false testimony" as Hankison asserts in its reply brief. If the defense thought this was misleading or incomplete, it could have been asked on cross-examination as defense counsel had the transcript with Walker's admissions.  But, regardless, whether Walker "legally" possessed the firearm has no bearing on Hankison's guilt or innocence in this case or the charges at issue, as such any alleged issue with this excerpt is harmless.

Finally, he was asked whether he found any evidence of drug dealing; but again, Vance testified that he was on scene and collected evidence on that evening.  He was asked extensively about what he found during his collection of evidence.  [DE 211, Trial Tr. Vol. 6-A at 12970-71].  In the lead up to the question about evidence of drug dealing he was asked:

> Q. Did you find any drugs in the apartment?
> A. No.
> Q. Did you find large amounts of money in the apartment?
> A. No, we did not.
> Q. Did you find any drug paraphernalia in the apartment?
> A. No.
> Q. Did you find any scales used to weigh drugs?
> A. No.

[DE 211, Trial Tr. Vol. 6-A at 12970, ln. 14-21].  He was asked if he found any evidence of drug dealing as part of his investigation that evening.  He said no.  There can be no argument that the prosecutor asked how he knew these things because he was asked extensively about what he did that evening.  This is not bolstering.

In the limited analysis after this excerpt, Hankison appears to argue that "[t]hese questions. . . appeal to various misnomers . . . [and] arouse anti-police sentiment amongst the jurors . . . the

questioning and testimony regarding no evidence of any drug dealing being found directly conflicts with the contents of the investigative summary Sgt. Vance prepared about this very incident." [DE 254 at 13606-07 (providing a copy of the investigative letter at Exhibit 2)].  It appears again that Hankison's argument is that it was misleading, not bolstering, which is also confirmed in his reply brief.  [DE 265 at 13807].  But, if Hankison felt this statement was contrary to Vance's Investigative Summary, which the defense was also in possession of, then Hankison had every ability to ask on cross-examination. But, because the line of questioning dealt with what Vance found that night in the apartment, the Court does not specifically find these answers misleading as the information cited by Hankison came from the later review of a forensic examination of Walker's cell phone.  [DE 254 at 13607].  Moreover, whether there was evidence of drug dealing by any individual in the apartment, does not bear on the actions taken by Hankison before the search of the apartment or the charges at issue in this case. While Hankison spends several pages on Walker's alleged drug dealing, this is a red herring and irrelevant to the outcome of the case.[14]

The last excerpt is from the testimony of Matt Russel and relates to his knowledge of statements made by Walker as to whether he took responsibility for firing at police.  [DE 254 at 13608-09 (citing DE 212 at 11857, ln. 22-58, ln. 10)]. Russel states on the record in response to question from the prosecutor that he reviewed Walker's statements and the video which was played for the jury, which is how he would have learned the information contained therein. [DE 212 at 11857, ln 4-58, ln. 4]. Even more telling he stated this again to defense counsel during cross examination and was asked about other statements specifically in the video played to the jury.  [DE

---

[14] To the extent Hankison seeks to give the impression to the jury that Walker is a "bad person," a "drug dealer," to somehow justify Hankison's decision to shoot, such argument is improper and seeks to persuade a non-guilty verdict on improper grounds.  Whether Walker fired because he was a drug dealer or because he was startled by the banging on the apartment door, it cannot be used to justify Hankison's actions unless he was aware of the facts before serving the warrant and it played into his decision to shoot and there in no such evidence.  In fact, the testimony is to the contrary.

212 at 11852, ln. 23-53, ln. 4]. Russel states how he learned the information he testified to in his testimony, and it was available to the jury.  Further, defense counsel makes no argument as to why this is bolstering, only that it is misleading because "Walker waited at least three hours before claiming responsibility for shooting at officers, as opposed to quickly taking responsibility as the prosecutor suggested."  [DE 254 at 13609].  But again, the question was whether he took responsibility the same night as the shooting, and the answer was "same night."  The statement is not misleading. If Defendant felt this was misleading, again counsel had the information and could have re-crossed on the issue. Counsel did not.  Moreover, as the Court indicated on the record, this had minimal relevance to the case as a whole.

## B. Whether any of the Prosecutor's Impropriety was so Flagrant it Amounts to Plain Error

Because the Court has not found any of the prosecutor's remarks improper, there is no need to analyze whether they were "flagrant," and amount to plain error warranting a new trial. Nonetheless, even if any of the above statements could be construed as improper, the Court could not find Hankison has demonstrated flagrancy.  First, even if the comments were improper, Hankison has not demonstrated that they tended to mislead the jury or prejudice him for the reasons already stated above. Second, while Hankison has alleged some of the statements are individually misleading, he has failed to show how the misleading nature of the statement relates to a relevant finding of the jury on count one. Hankison merely makes sweeping generalized statements without any specific connection between how the jury was mislead on any issue material to the ultimate outcome of the case. [DE 254 at 13609 (stating only, "[v]irtually all of the questioning, testimony and remarks referenced above had the effect of misleading the jury, or outright prejudicing Defendant—particularly the litany of improper statements made during closing arguments," and citing to nearly the entire brief); DE 265 at 13805 (noting only that "[m]any of the improper

statements/comments mentioned focus specifically on the inappropriateness of Defendant's decision(s) to shoot," without citation]. For instance, Hankison fails to show how a misleading statement by Vance in regard to Walker's conceal carry permit or whether he was a drug dealer would mislead the jury in relation to an element necessary for a guilty verdict on count one. Whether Walker "legally" possessed the firearm used to shoot at officers or whether he was a drug dealer, would not tend to mislead the jury as to any of the four elements of the crime charged in count one. It is also notable that the jury found Hankison not guilty as to count two, which applied to Taylor's neighbors, while count one applied to Taylor. The factual basis and elements of counts one and two were otherwise identical. It would be difficult to find the statements mislead the jury or prejudice Hankison when the statements applied to count two and the jury found Hankison not guilty on count two. Because Hankison fails to establish any prejudice in terms of something that would have mislead the jury substantially affecting the outcome, this argument must be rejected.

Nor has Hankison demonstrated the allegedly improper statements were deliberate. [DE 265 at 13805 (arguing only "There is no doubt that the improper conduct referenced in this Reply and Defendant's underlying Motion based on the strategic use and timing by the prosecution. *Passim.*")]. While Hankison alleges deliberateness because many of the statements were made in closing argument, that argument is weak given the record in this case. [DE 254 at 13610 (citing *Bates v. Bell*, 402 F.3d 635, 648 (6th Cir. 2005)]. As stated previously, as much of the closing argument related specifically to trial testimony, it is difficult to argue that citation to such statements is "deliberate" in terms of prejudicing the Defendant. The prosecution's closing argument closely mirrored the themes of the testimony.

Finally, Hankison fails to demonstrate that the evidence against him was not strong. Both parties extensively address the strength of the evidence. [DE 260 at 13744-55; DE 265 at 13785-98]. The United States asserts that

> The jury's guilty verdict was supported by compelling evidence, including the defendant's own admission that he fired five shots through Breonna Taylor's covered bedroom window despite not being able to see into her apartment, sending bullets flying over Ms. Taylor's head and leaving the defendant's fellow officers 'shocked' and in 'disbelief' at his 'totally inappropriate' conduct. The defendant's blind shots violated the most basic deadly force rules that he had been taught repeatedly—rules that were followed by the other officers on scene who forcefully condemned his actions during this trial. The testimony of those officers, combined with extensive evidence of the defendant's training, undisputed ballistics evidence showing the harrowing path of his bullets, dozens of pictures of the scene, video and audio recordings taken moments after the shooting, testimony from experts and crime scene investigators, and the defendant's own admissions proved his guilt overwhelmingly.

[DE 260 at 13743 (citation omitted)]. Defense on the other hand states that there is no strong evidence of guilt and that

> [t]he overwhelming majority of evidence described in support of its Response lacks full context, is misleading or outright false, was knowingly improperly elicited by the prosecutors from witnesses, and further support granting Defendant's Motion due to their misconduct.

[DE 265 at 13786]. Hankison highlights a lack of training received by defendant [*id.* at 13786-89], Hankison's testimony that Taylor was suspected of being involved in a criminal syndicate [*id.* at 13789-90], that the officers provided ample time for occupants of the apartment to answer the door before breaching [*id.* at 13790-93], inappropriate inferences regarding Mattingly's and Cosgrove's actions in the doorway [*id.* at 13793-95], that Hankison discharged his firearm in response to a perceived deadly threat after seeing the shooter in the doorway and almost being shot [*id.* at 13795-97], that "[a]ll three officers who identified or witnesses the shooter returned fire [*id.* at 13797-98], and finally, that other officers' reactions to the shooting were given with 20/20 hindsight [*id.* at 13798].

A retelling of the evidence here is unnecessary. The Court cautioned counsel on several occasions throughout the trial regarding what this trial was, and was not, about. It was not about the veracity of the warrant. The warrant is relevant only in so much as it was the reason Hankison was at the apartment. It was not about whether Taylor or Walker or anyone else was involved in a "criminal syndicate." Taylor's background does not affect her right to be free from unreasonable seizures and Taylor's activities and background are only relevant in so much as what Hankison knew about it at the time he served the warrant. It was not about whether SWAT should have served the warrant. This case was about whether Hankison's decision to shoot at the moment he shot, from the location he shot, and under the circumstances he perceived, was objectively unreasonable "consider[ing] all the facts and circumstances as they would be viewed by an ordinary and reasonable officer on the scene at the moment forced was used." [DE 228, Jury Instructions, at 10887].

The Court turns to the jury instructions to determine if there was strong and ample evidence for a finding of guilt. [DE 228].

> For you to find the defendant guilty of the crime charged in Count 1, Deprivation of Rights Under Color of Law, you must find that the government has proven each of the following four elements beyond a reasonable doubt:
>
> First: That the defendant acted under color of law. The parties have stipulated that the Defendant was acting under color of law on March 13, 2020;
>
> Second: That the defendant deprived a living victim, Breonna Taylor, of a Constitutional right, in this case, the right to be free from unreasonable seizures, which includes the right to be free from a police officer's use of unreasonable force;
>
> Third: That the defendant acted willfully; and
>
> Fourth: That the offense involved either (1) the use of a dangerous weapon or (2) an attempt to kill.

[DE 228 at 10883]. The first element was stipulated. As to the second element, it was not disputed that the trajectories of two bullets from two of Hankison's shots were very close to Taylor's body, [DE 211, Trial Tr. Vol. 6-A at 12985], such that she would have been unable to leave the apartment or seek treatment for her wounds. There was strong evidence as to this element.

As to the third element, based on the testimony of numerous officers regarding basic firearms training, it is both logical, and well established by the testimony, that an officer should not shoot unless the officer has identified and can see the intended target of his weapon. [DE 215, Trial. Tr. Vol. 7-B at 11948-50; DE 248, Trial Tr. Vol. 7-A 1335, 13340-41]. Hearing a firearm or seeing a muzzle flash were established not to constitute target identification. [*Id.*] The same is true that an officer should not shoot unless the officer has isolated the intended target. [*Id.*] And further it was well established by the training testimony, as well as the law, that a police officer may use deadly force when that force is reasonably necessary to protect himself or someone else from an imminent threat of death or serious bodily harm. [DE 228, Jury Instructions at 10887-88]. While not definitive of whether the force was unreasonable, the elements of training regarding use of deadly force were strongly established. Hankison's own testimony established that he did not follow these elements of his training. He admitted that he had been training on standards about target identification but that he fired shots into a covered sliding glass door and covered bedroom window. [DE 222, Trial Tr. Vol. 9-B at 12335, 12341; DE 240, Trial Tr. Vol. 10 at 11502-03; 11522-23, 11568-69, 11574-75]. There was strong evidence as to the third element of willfulness.

As to the fourth element, there was no dispute that Hankison's shots were fired with a dangerous weapon. [DE 222, Trial Tr. Vol 9-B at 12334-42]. Moreover, there was testimony from Hankison that he specifically intended to stop the threat and that he fired until he heard other

firing stop confirming to him that the threat was gone. [*Id.*] As a result, the jury found and there

was strong evidence that there was an intent to kill.  [DE 233].

In short, even if any of the prosecutor's statements were improper, Hankison has not shown

that they "were flagrant enough to warrant reversal." *United States v. Wells*, 623 F.3d 332, 337–

38 (6th Cir. 2010).  And, as noted above, because Hankison did not object at trial he would be

required to prove any misconduct "exceptionally flagrant." *United States v. Phelps*, No. 20-5889,

2021 WL 4315947, at *5 (6th Cir. Sept. 23, 2021).  Because he fails to demonstrate flagrancy, he

cannot demonstrate plain error.  Nonetheless, as explained above, Hankison has not shown that

the prosecution or the Court committed any errors.  Thus, Hankison is not entitled to a new trial

under the plain error standard.

### C.  Cumulative Error Theory

Under cumulative-error analysis, "a defendant must show that the combined effect of

individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *Trujillo*,

376 F.3d at 614 (where defendant failed to identify any error to combine with an incident of

harmless error, defendant could not show that he was "denied a fundamentally fair trial"); *Christie*,

2024 WL 1998512, at *3–4. "That is so because errors that might not be so prejudicial as to amount

to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting

that is fundamentally unfair." *United States v. Warman*, 578 F.3d 320, 349 (6th Cir. 2009) (citing

*Trujillo*, 376 F.3d at 614). Defendant is not entitled to relief under the cumulative error theory if

he only identifies a single harmless error. *Trujillo*, 376 F.3d at 614.

Further, the cumulative-error analysis authorizes the Court to look only at actual errors, not

non-errors. *United States v. Wheaton*, 517 F.3d 350, 372 (6th Cir. 2008) (citing *Campbell v. United

States,* 364 F.3d 727, 736 (6th Cir. 2004) (acknowledging that "trial-level errors that would be

considered harmless when viewed in isolation of each other might, when considered cumulatively, require reversal of a conviction," but explaining that "the accumulation of non-errors cannot collectively amount to a violation of due process" (internal quotation marks omitted)).

As explained above, Hankison has not shown any errors and even if errors were made, he has failed to show that any could be considered flagrant or such seriously affected the fairness or integrity of the proceeding.  And finally, based on the substantial evidence of guilt, none come close to affecting the outcome of Hankison's trial. Consequently, Hankison is not entitled to relief under the cumulative-error theory. *United States v. Conley*, No. 3:23-CR-14-DJH, 2024 WL 3609104, at *5 (W.D. Ky. July 31, 2024) (citing *United States v. Deitz*, 577 F.3d 672, 697 (6th Cir. 2009) ("[C]umulative error analysis is not relevant where no individual ruling was erroneous.") and *United States v. Buendia*, 733 F. App'x 816, 820 (6th Cir. 2018) ("[Defendant's] cumulative-error argument cannot succeed because she has shown no error.")).

### D.  Split-Verdict

Under either theory put forth by Hankison, it is important to note that the two counts for which Hankison was tried were substantially similar in nature and of similar statutory construction. [DE 228 at 10883-10893]. Both required consideration of the same witnesses' testimony and both required a finding on four substantially similar elements, the only difference being the specific constitutional right at issue based on how the victims were situated--Ms. Taylor in the apartment subject to the warrant and the other victims as innocent bystanders in an adjoining apartment. [DE 228 at 10883-10893; DE 241 at 12839-41 (prosecutor's description of these differences in closing)]. The elements were described by the prosecutor generally as to both counts: "number one, that the defendant acted under color of law . . . Number two, that the defendant deprived a victim in each count of a right protected by the United States Constitution. Number three, that the

defendant acted willfully. And number four, that the offense either included the use of a dangerous weapon or involved an attempt to kill." [DE 241 at 12839]. The prosecutor made the same basic argument for guilt both counts.

> So in other words, the evidence you've heard during trial proves that Sergeant Mattingly and Detective Cosgrove, when they fired immediately through the open doorway at a person they could still see who had shot at them, they were justified, but the defendant ran around to the side of the apartment later and fired blindly through covered windows that he could not see into, he was not justified.

[DE 241 at 12840-41]. The prosecutor did not make a unique or separate argument as to the reasons the jury should find Hankison guilty on count one versus count two. The United States' arguments as to both counts were consistent and made simultaneously in closing argument. As a result, even if the Court had found any of the prosecutor's statements improper, the split-verdict allays any concerns that the statements, misled the jury, were prejudicial or affected the verdicts. If the alleged improper statements prejudiced the defendant or somehow tipped the scale in favor of guilt on count two, the same would have been true on count one.

As set forth in *Chaney*, 211 F. Supp. 3d at 984, *aff'd*, 921 F.3d 572, the Sixth Circuit specifically considered the effect of a split verdict on general claims of prosecutorial misconduct during closings.

> … [T]he jury returned a carefully drawn split verdict on the Chaneys' 256-count indictment, finding the Chaneys guilty of many counts but acquitting them of over a hundred others. If this minor, isolated comment about the Chaneys' house—which did not directly pertain to any specific count of the indictment—had somehow tainted the jury's general impression of the Chaneys' culpability, it is curious that the jury nevertheless found them innocent of over a hundred charges.

*Id.* (citing *United States v. Morales*, 655 F.3d 608, 633 (7th Cir. 2011) ("These split verdicts imply that the jury reached independent conclusions as to each defendant without making up its mind before the close of the evidence."); *United States v. Bradley*, 644 F.3d 1213, 1279-80 (11th Cir. 2011) (holding that evidence the jury "partially acquitted" defendants "provides circumstantial

evidence that the jury did indeed 'consider[ ] the charges individually and assess[ ] the strength of the evidence as to each charge.'") (citations omitted)).

Other circuits have found similarly, even after a finding of prosecutorial misconduct in closing arguments:

> Of course, a split verdict is not unassailable evidence that a jury was unmoved by the government's wrongful remarks, especially when, as here, the government's improper statements addressed issues that were central to the case. Still, the jury's conduct in this case indicates that it "took [the court's] instruction[s] to heart and weighed the evidence, unswayed by whatever passions and prejudices the prosecutor['s] statements might have attempted to stoke."

*United States v. Khatallah*, 41 F.4th 608, 642 (D.C. Cir. 2022)(quoting *United States v. McGill*, 815 F.3d 846, 922 (D.C. Cir. 2016)); *see also United States v. Small*, 74 F.3d 1276, 1284 (D.C. Cir. 1996) (citing *United States v. Boney,* 977 F.2d 624, 631–32 (D.C. Cir. 1992) and finding "[t]he split verdict, acquitting Small of the bathroom-drug charge, itself refutes any inference that the jury gave undue weight to matters that were not in evidence and failed to follow the instructions."); *Ueland v. Fabian*, 2009 WL 537615, at *6 (D. Minn. Mar. 3, 2009) (finding that a "split verdict resulting from the petitioner's acquittal on two of three charges strongly suggests that the jury was not unduly inflamed by the prosecutor's comments" in closing argument and that "Petitioner was not denied his right to a fair trial as a result of the prosecutor's final argument.").

The Court finds the same is true here.  Even if the prosecutor had made improper comments during closing or even if the comparative testimony of the officers was improperly admitted as suggested by Hankison, the split verdict allays any concerns that the jury was misled or that defendant was unfairly prejudiced.  Given the jury's need to consider the same evidence and arguments of the prosecutor as to a finding of guilt as to both counts, the split verdict makes clear, that neither the comments of the prosecutor, nor the comparative testimony, improperly influenced the jury or led them astray of the instructions.  It is clear that this jury "took [the court's]

instruction[s] to heart and weighed the evidence, unswayed by whatever passions and prejudices the prosecutor['s] statements might have attempted to stoke." *Khatallah*, 41 F.4th at 642.

### III.    CONCLUSION

For the reasons stated above, and the Court being otherwise sufficiently advised, Hankison's motion for leave to file supplemental authority [DE 269] is **GRANTED** and his motion for new trial [DE 254] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

July 18, 2025

cc: counsel of record